In the Matter of James R. WILLIS, Jr., Debtor.

GENERAL MOTORS ACCEPTANCE CORPORATION, Plaintiff,

v.

James R. WILLIS, Jr., Defendant.

Bankruptcy No. 80 B 7780.

United States Bankruptcy Court, N. D. Illinois, E. D.

Oct. 9, 1980.

Michael L. Thiel, Chicago, Ill., for plaintiff.

Kornfeld & Spitz, Chicago, Ill., for defendant.

## OPINION AND ORDER

RICHARD L. MERRICK, Bankruptcy Judge.

This cause arose on a motion of General Motors Acceptance Corporation (hereinafter "G.M.A.C.") that the confirmation of a Chapter 13 plan be vacated because the Court refused to approve as being excessive a priority stipulation respecting a 1979 Buick Riviera. The particular significance of this claim is that the plan proposes to pay secured creditors 100% of their claims in contrast to 10% for unsecured creditors, over a period of fifty–three months. The plan affords a second priority to an automobile security, which becomes a first priority because current mortgage payments are to be made outside the plan.

This opinion will be considerably broader in its scope than it would need to be if it were to be limited to the precise issue before the Court. The reason for the expanded opinion is that the elemental questions to be considered here are similar to those frequently presented in Chapter 13 plans at one of several stages or in Chapter 7 proceedings at the time of the reaffirmation hearings. The question of determining the present value of an automobile is the same whether the question is raised in a Chapter 7 or a Chapter 13, case. The question of determining the future equivalent of present value is substantially the same in most respects; the differences between the chapters will be described as they arise.

The purpose of the detailed analysis of the elements of installment contracts is that the Court wishes to establish guidelines which will be followed by attorneys practicing before the Court. If other courts choose to adopt the guidelines, so much the better. At least this Court will not have to repeatedly and at considerable length, analyze and explain figures which have little economic reality during crowded courtroom hours. It has been this Court's experience that neither the debtors, nor the creditors, nor their respective attorneys understand

many of the implications of the agreements which they propose for court approval. From decisions which have come to the attention of the Court it is apparent that many courts do not appreciate all aspects of the problems either.

As a matter of exposition there first will be set out the guidelines by which the Court expects to establish a pattern which will eliminate the need for repetitious hearings on present and future value of collateral at Chapter 7 reaffirmation hearings and at Chapter 13 confirmation hearings. A recital of the guidelines will be followed by an explanation for selecting each aspect of them. Finally, the guidelines will be applied to the specifics of the instant case. It goes without saying that the guidelines establish maximum allowable values and that any lower values reached by the parties will be acceptable to the Court because lower secured values always will benefit the debtor or unsecured creditors.

## GUIDELINES

■ 1. The agreement or stipulation will state

(a) as separate dollar figures

(i) the present value of the collateral,

(ii) the amount of interest to be added,

(iii) the sum of the present value and the amount of interest.

(b) the annual percentage rate, and

(c) the monthly payment.

2. The reaffirmation agreement or stipulation will state that calculation of unearned interest will be by the straight line method of accounting.

3. The reaffirmation agreement or stipulation will state that there shall be no further interest or other charges except those specified above. (If no interest is to be included in the reaffirmation or stipulation, that shall be stated in paragraph 1).

1. *Compliance Clause*
    The undersigned hereby certify that the above agreement conforms to the principles set forth in *In re Willis* 80B 7780.

■ 4. A compliance clause signed by the attorneys for the debtor and creditor, respectively, shall appear below the signature of the debtor and the creditor, and it shall state that the agreement complies with the principle enunciated in *In re Willis*, 80 B 7780.[1]

■ 5. Interest over the term of the repayment period will be allowed against the present value at an annual percentage rate not to exceed ½ of 1% more than the auction average of 3 month United States Treasury Bills on Monday of the week in which the petition for relief under Chapter 7 or Chapter 13 was filed.

■ 6. The details of the calculation of present value need not be stated nor does the collateral have to be described in detail, but the calculation shall conform to the following standards:

(a) *Automobiles*

The Average Trade–In value as shown in the N.A.D.A. Official Used Car Guide for the month in which was filed the debtor's petition for relief will be taken as present value.

(b) *Furniture*

The cost of the furniture new will be used as a base against which the following percentages shall be applied to determine present value:

| | |
|---|---|
| Less than one year old | 75% |
| One year to two years old | 50% |
| Two years to three years old | 25% |
| More than three years old | 0 |

(c) *Appliances (including TV and Stereo)*

The cost of the appliances new will be used as a base against which the following percentages shall be applied to determine present value:

| | |
|---|---|
| Less than one year old | 80% |
| One year to two years old | 65% |
| Two years to three years old | 50% |
| Three years to four years old | 25% |
| More than four years old | 10% |

| Attorney for Creditor | Attorney for Debtor |
|---|---|

Date _____

#### (d) *Carpeting and Draperies*

The cost of the finished goods new will be used as a base against which the following percentages shall be applied to determine present value:

| | |
|---|---|
| Less than one year old | 25% |
| One year to two years old | 10% |
| More than two years old | 0 |

Valuation hearings will be conducted on the first and third Mondays of each month at 8:00 a. m. for the purpose of establishing present value in any circumstances where the adversary parties are unable to reach an agreement on present value which complies with the foregoing guidelines, or are unable to agree on the conversion of the present value to future value.

### EXPLANATION OF GUIDELINES

#### 1. *Time of Valuation Hearings*

This Court feels that it is a waste of a lawyer's time to be sitting in a crowded courtroom waiting for a case to be called. The waiting may represent a double expense to the debtor if he has to pay for the lawyer's time and also is losing the wages which he might have been earning otherwise. Spreading the court call out over a greater number of hours reduces the courtroom congestion and needless waiting. An early hearing time may produce an incidental benefit by causing to be settled those matters over which there is only a minor difference of opinion, thereby permitting courtroom hours to be devoted to matters over which there is a serious controversy.

#### 2. *Ascertainment of Present Value*

#### (a) *Automobiles*

The Used Car Guide published by the National Automobile Dealers Used Car Guide Co. probably is the most widely used of the guides to automobile values. It is the one which this Court has found to be most useful and has been established as the norm for that reason. The Guide assumes a clean car with average mileage for its age. High mileage and low mileage adjustments are contained in the Guide. The attorneys will be allowed to use their discretion on the reduction to be applied against a car in poor condition, with this caveat—The debtor probably will be the only witness with knowledge of the condition of the car under consideration, and he has an interest in the outcome. If the attorneys wish to use some other method of valuation, they should feel free to do so, but the value at which they arrive will be subject to scrutiny by the Court and will not be approved without a separately scheduled valuation hearing.

#### (b) *Household furnishings*

There is no acceptable guide to the value of used household furnishings for two principal reasons:

(1) there is not a limited number of standard models with a broad ownership of each model, and

(2) the use and abuse to which the furniture is subjected will have tremendous variations.

The percentages given here are intended to represent a reasonable average, and it is considered unnecessary to take recognition of the probability that a stove will outlast a television set.

#### 3. *Meaning of Value*

Value is defined in several different ways in the Code. § 506(a) provides a flexible meaning of value:

"... Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of the property..."

Obviously a standardized procedure cannot be based upon such a subjective approach. The generally accepted meaning of market value is that it is the amount which a reasonable willing buyer not under compulsion to buy would pay to a reasonable willing seller not under duress to sell. To the extent that such a meaning is not acceptable to the respective attorneys a valuation hearing may be held to deal with exceptional situations. That meaning of value appears to be consistent with the exemption section of the Code:

"Sec. 522(a). In this section . . . (2) 'value' means fair market value as of the date of the filing of the petition..."

One reason for adopting average trade–in value for automobiles is that it covers a broad series of transactions between willing buyers and willing sellers, and the sellers (of the traded–in cars) are consumers similar to the debtors before the Court.

4. *"effective date of the plan"*

■ § 1325(a)(5)(B)(ii) of the Code provides in part with respect to the valuation of collateral:

"§ 1325(a). The Court shall confirm a plan if—

(5) with respect to each secured claim provided for by the plan—

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; . . ."

In order to have a standard procedure for Chapter 13 plans and to coordinate that procedure with Chapter 7 cases a uniform method of establishing a valuation date is required. The one element which all cases have in common is a filing date. That date will be considered the "effective date" for valuation purposes in the absence of exceptional circumstances that might require a valuation hearing. Due to the fact that the collateral in every instance will be used personalty which would not be expected to fluctuate in value to any considerable extent within the space of several months and also due to the fact that any fluctuations which might take place probably would be within the usual margin of error in establishing a value in the first instance, it is anticipated that the date of the filing of the plan will be accepted universally as the appropriate valuation date, without regard to whether it is the "effective date of the plan."

5. *Conversion of Present Value to Future Value*

In writing this section the Court was reminded of children's table games in which by landing on certain spot the player can skip a portion of the route and go directly to another spot. Any reader who has arrived at Item 5 of the Explanation of Guidelines may go directly to Item 6 without missing any significant legal discussion. Items 5(a) through 5(g) largely are economics and mechanical. They explain why many existing procedures do not work as intended, but if a person is willing to accept the principles without understanding them, he may omit what necessarily is rather ponderous reading.

(a) *The Nature of Interest*

The payment of interest serves a double purpose:

(i) it compensates the lender for the delay in receipt of payment of the principal, and

(ii) it compensates the lender for the risk that the contract will not be performed according to its terms.

Analyzing first the issue of risk we find that for an American resident ownership of a United States obligation is risk free, whether it is a Treasury Bill, a Treasury Note, or a United States Bond. Each of them is payable in a constant number of United States dollars. These dollars are legal tender for anything which the American resident may wish to purchase in this country. The same faith and credit stands behind the term obligations as behind the currency. If the term obligations were payable in gold (and the gold clause were respected), there would be a risk that at maturity the United States might not have enough gold to redeem the obligation. But if the United States does not have enough dollars at the maturity, it starts up the printing presses and creates enough. Theoretically the printing of an additional 1,000 dollars does not increase the national debt because it represents the substitution of one thousand $1 obligations for one $1,000 obligation. The risk of inflation, for example, lies in the medium of payment and not in the debt instrument. Upon maturity a United States Treasury Bill will be redeemed for 1,000 dollars, and there is no

risk that the redemption will not occur. What the 1,000 dollars will be able to buy may affect the desirability of the investment but that is because of lack of confidence in the medium of payment and not in the debt instrument itself.

With a private corporation, such as the creditor in the instant case, G.M.A.C., two theoretical risks are present for a lender. The maker does not control the medium of payment so that there is a risk that it may not be able to obtain one thousand dollars at maturity to use for redemption purposes. The second risk, which is closely related, is that the corporation may not exist at maturity, or may be barred from making payment for other reasons. Although these risks are not great, they are sufficiently large so that day in, day out, G.M.A.C. may be expected to have to pay an interest rate of about ½ of 1% higher than would the United States to borrow money for the same length of time. Both G.M.A.C. and the United States suffer from the lack of confidence which investors have in the medium of payment which they both use, that is, United States dollars. If the inflation rate is expected to continue at a 10% rate, investors will want to receive a 10% higher return than they would have accepted otherwise just in order to stay even in relation to everything else.

The non–risk aspect of interest is that it is a compensation for use of the principal. (For a discussion of the impact which charges for the use of money have had on the historical development of property law, see *In re Michigan Avenue National Bank*, 2 B.R. 171, 22 CBC 262 (Bkrtcy.1980).

Both aspects of interest come into play when an attempt is made to equate future payment with present value. Much that has been written about "adequate protection" and "indubitable equivalence" fails to recognize that an ironclad guaranty of $100 one year from now is not the economic equivalent of $100 now; $112 one year from now might be the economic equivalent of $100 now. The dichotomy between the legal and economic approaches to "indubitable equivalence" frequently is not observed, but with respect to liens on personal property in consumer cases the Code clearly appears to conform to the economic approach.

#### (b) *Pre–computed interest*

Most of the secured loans which become the subject matter of reaffirmation agreements and stipulations contain pre–computed interest. Their nature and structure is different from the familiar loan forms, and a description of what they are will be preceded by a description of what they are not.

The simplest form of loan is a conventional bank loan in which a person borrows and receives a stated sum of money. At maturity he repays the principal and also interest at whatever had been the agreed rate. There are no interim payments of either principal or interest. On a $1,000 loan for six months at 10%, the borrower will repay nothing until the end of the period and then will pay $1,050.

The next most common form of loan is a mortgage loan, where the borrower makes monthly payments which are constant in amount and combine principal and interest. For example, there might be a $24,000 twenty year mortgage at 10%. Interest for the first month would be $200 ($24,000 × .10 ÷ 12 = $200). Let us say that a principal payment of $100 is required also. Going into the second month the householder has a loan of $23,900. Interest on that amount is $199.17 per month. If there is a $300 payment, principal will be reduced by $100.84. Going into the third month the householder has a loan of $23,-799.16. Interest on that amount for one month is $198.33, so that the principal reduction in the third month will be $101.67. Each month for twenty years the principal reduction will be 83 cents greater than it was the month before, and the interest payment will be 83 cents less than it was the month before.

In the example of the bank loan, the borrower had the entire principal for the full term of the loan. In the example of the mortgage loan the principal amount of the loan was being reduced periodically at a constant rate. In a typical retail install-

ment contract the interest is added to the amount borrowed at the beginning. For example, assume a $5,000 purchase financed at 10% for three years. Simple interest will be $500 per year, and for three years will equal $1,500, producing a figure of $6,500, which has to be repaid in 36 months, and commonly is referred to as the "deferred payment price." This will require monthly payments of $180.56. The allocation of the $180.56 between principal and interest will be discussed below. At the moment it is sufficient to state that because of the continuous reduction of principal the amount borrowed will decline constantly and over the life of the loan will average somewhat more than one–half of the amount borrowed originally.

### (c) *Rebates*

Where a retail installment contract runs its full term all of the pre–computed interest becomes earned, but where the contract is paid off before maturity a portion of the interest has not become earned and has to be rebated. The standard method of computing rebates is under the Rule of 78's.

The Rule of 78's, also called the sum–of–the–digits method, derives its name from the fact that most retail installment contracts are described in terms of months to maturity, and there are twelve months in a year. The sum of the digits 1 through 12 equals 78 $(1+2+3+4+5+6+7+8+9-+10+11+12 = 78)$. Because the reader probably is familiar with accelerated depreciation in real estate, that will be reviewed briefly before returning to the Rule of 78's.

Improved real estate normally is depreciated over its useful life. The estimated salvage value at the end of the life is deducted from the original cost, which produces the amount subject to depreciation. If a constant rate of depreciation is taken each year, it is called the straight line method; on a building with a useful life of 20 years, $1/20$ would be taken as depreciation each year.

Recognition has been given to the fact that most tangibles depreciate faster early in their lives than they do later by allowing accelerated depreciation. One of the common methods of accelerated depreciation is sum–of–the–years digits, or SYD. This is identical in principle to the Rule of 78's. Assume a building with a 20 year life. The sum of the digits 1 through 20 is 210. In the first year $20/210$ of the depreciable cost of the building can be taken; $19/210$ in the second year, and progressively down to $1/210$ in the last year. Over the 20 year life, $210/210$ of the depreciable cost will have been written off. The reciprocal of the depreciation taken is the unused depreciation. At the end of ten years, $155/210$ will have been taken, and $55/210$ will remain.

The Rule of 78's is identical to SYD depreciation if one treats interest earned as being the equivalent of depreciation taken, and interest not earned as being the equivalent of depreciation not used. Returning to the example of the $5,000 retail installment contract payable over 36 years with interest at 10%, the interest due under the contract if it went full term was $1,500. Let us assume that the contract was paid in full at the end of 18 months. The sum of the digits 1 through 18 is 171, and from 1 through 36 is 666. $171/666$ of the $1,500 interest would be rebated, and the balance $(495/666)$ would be considered as having been earned. $385.14 would be rebated, and $1,114.86 would have been earned.

The method by which the monthly payment of $180.56 would be allocated between principal and interest is as follows:

In the first month $36/666$ of the total interest is taken as earned, or $81.08. Deducting this from $180.56 leaves $99.48 as being applied to principal. In the second month $35/666$ of the total interest is taken as earned, or $78.83. Deducting this from $180.56 leaves $101.73 as a reduction in principal. For the third month the figures would be $34/666$, or $76.57, interest earned and $103.99 reduction in principal. Thus if the loan should be paid off at the end of three months, the principal balance would have been reduced by $305.75. On a loan of $5,000 the buyer would have paid $541.68 and still would owe $4,694.25. His effective interest rate

for the first month was 19.46%; for the second month it was 19.30%, for the third month it was 18.76%, an average rate of 19.17% for the three months.

The bias which the Rule of 78's produces for the lender pertains only where the loan is prepaid or where the loan is defaulted. If the loan is prepaid, the lender gets credit for a disproportionate amount of interest, which increases the principal remaining to be paid by the borrower. If the loan is defaulted, the result is the same. A disproportionate amount of the early payments is treated as interest with the result that the deficiency payable by the borrower is large.

Where the loan is paid in full, the Rule of 78's has no application. The total amount of interest paid does not vary according to the method of allocating interim payments between principal and interest.

Illinois has four basic small loan laws:

(a) The Consumer Finance Act (1979 Ill. Rev.Stat. Ch. 74, Secs. 19–46) covers loans up to $1,500 and contains an interest rebate section contemplating but not requiring the Rule of 78's (Sec. 31(c)1);

(b) The Consumer Installment Loan Act (1979 Ill.Rev.Stat. Ch. 74, Secs. 51–77) covers loans between $800 and $10,000 and contains an interest rebate section contemplating but not requiring the Rule of 78's (Sec. 65);

(c) The Retail Installment Sales Act (1979 Ill.Rev.Stat. Ch. 121½ Secs. 501–533) covers goods used primarily for personal, family, or household purposes, excluding automobiles, and contains an interest rebate section contemplating but not requiring the Rule of 78's (Sec. 507);

(d) The Motor Vehicle Retail Installment Sales Act (1979 Ill.Rev.Stat. Ch. 121½, Secs. 561–586) covers automobiles, trucks and trailers, and contains an interest rebate section contemplating but not requiring the Rule of 78's (Sec. 567).

At the Federal level, the Truth in Lending Act (Consumer Credit Protection Act, 15 U.S.C. § 1601 et seq.) provides generally for disclosure of credit information on credit transactions of less than $25,000 to individuals, primarily for personal, family, household or agricultural purposes. It does not contain any limitation on the method of making rebates. The most influential of the enforcement arms of the Act is the Federal Reserve System, controlling member banks. Its Regulation Z requires only that the method of computing a rebate be disclosed (12 CFR 226.8(b)(7)).

■ Notwithstanding the acquiescence of various state and regulatory authorities in the Rule of 78's, this Court finds that it is slanted unduly in favor of the creditor and will not permit its use on precomputed interest add–on loans, which require the Court's approval, that is, on either reaffirmation under Chapter 7 or the establishment of secured priority claims under Chapter 13. The finance companies may continue to use their existing programs if they are able to interpolate in such a manner that they can calculate an appropriate base interest rate by starting with the annual percentage rate which is their maximum. Their programs can continue to be based upon the Rule of 78's, but the agreements must state that interest will be calculated on a straight line basis in the event of prepayment or default. In either of those events a simple transfer of interest paid to principal paid can be made in the account of the debtor. Whether or not the finance company wishes to reduce its earnings for tax or other purposes is not the concern of this Court. The important factor is that the agreement provide that a proportionate amount of interest will be allocated to each month of the scheduled payment period in the event of prepayment or default.

### (d) *Appropriate Interest Rate*

As the Bankruptcy Courts around the country have dealt with this issue they have come up with a number of suggested rates, such as legal rate, prime rate, Federal Reserve discount rate, and 3 month Treasury Bill Rate. It is suggested that each of these rates is inappropriate because it does

not address the problem, which is, compensating the secured creditor for the delay in enabling him to enjoy the fruits of his security agreement. He is entitled to the present value of the collateral plus the value of the difference between present enjoyment and future enjoyment.

In Illinois the legal rate, that is, the interest rate paid on judgments is 9% (1979 Ill.Rev.Stat., Ch. 74 Sec. 3); 9% happens also to be the usury rate, that is, the maximum rate permitted to be charged on loans to individuals for non–business purposes (1979 Ill.Rev.Stat., Ch. 74 Sec. 4). Neither of these figures has any relationship to a secured creditor in a bankruptcy proceeding.

For the most part the Bankruptcy Courts will be dealing with finance companies, which do not have large amounts of static capital to finance installment contracts. Those companies go into the money markets on a continuing basis to obtain the money which they use for current loans. In broad terms their consumer finance business consists of borrowing money in public money markets at current rates and relending it to consumers at slightly higher rates. In theory, when the Bankruptcy Court approves a reaffirmation, the finance company has borrowed, or will borrow, an amount of capital equal to the principal in order to carry the loan. If the finance company should be authorized a rate less than its borrowing costs, the future value will not be equivalent to the present value; it will be less. If the finance company is authorized a rate greater than its borrowing costs, it is making a profit on the delay and will be receiving more than the present value of the collateral.

As will be explained more fully below, those courts which have been authorizing interest at 9% on reaffirmations in all likelihood have been causing the debtors to pay interest at a rate of 16.2% for a one year repayment period, 16.5% for a two year repayment period, and 16.3% for a three year repayment period.

### (e) *United States Treasury Bills*

Every week on Monday (or the preceding Friday if Monday is a holiday) the United States Treasury auctions Treasury Bills to be issued the following Thursday and to mature on a Thursday thirteen weeks later. They are most commonly called 3 Month Bills, 90 day Bills, 91 day Bills, and 13 week Bills. The Bills are issued at a discount and redeemed at par, the difference being the interest earned during the interval. These 3 month Bills represent the best gauge of the current cost of short term money, and for that reason they have been chosen as the base rate for establishing the future equivalent of present value. To that base rate will be added fifty basis points if the rate is expressed as a decimal or ½ of 1% if the base rate is expressed as a percentage. The interest rate to be allowed as compensation for the delay in obtaining possession of the secured collateral will be ½ of 1% above the auction average of 3 month Treasury Bills on Monday of the week in which the petition for Chapter 7 or Chapter 13 relief, as the case may be, was filed.

The spread between what the major finance companies and the United States must pay for short term funds normally will range from somewhat less than ½ of 1% to somewhat more than ½ of 1%; ½ of 1% is sufficiently close to the middle of the range to be representative. To be compatible with the common inexpensive amortization tables which do not measure yields in increments less than ¼ of 1%, a workable spread would have to be ¼ of 1%, ½ of 1%, or ¾ of 1%. The figure chosen of ½ of 1% is closer to an historical average of the differentials than would be ¼ of 1% or ¾ of 1%, and for that reason it will be used. The annual percentage rate may not exceed a rate which is ½ of 1% higher than the auction average of 3 month Treasury Bills on Monday of the week in which the applicable petition was filed.

The Monday average auction rate can be obtained from the financial pages of Tuesday's issues of most of the metropolitan newspapers, or from the Bond Department of any bank dealing in government bonds,

or from most stock or bond brokers. The auction rates for the preceding twelve Mondays, together with the maximum permissible annual percentage rate, also will be posted on this Court's bulletin board.[2]

For example, this opinion was drafted Monday, October 6, 1980. The average auction rate on new 13 week Treasury Bills on that day was reported as 11.295% in the Tuesday's Wall Street Journal, and as 11.30% in The New York Times. Either figure is a satisfactory base to which to add 50 basis points, (the Court will round up at .005) producing a maximum annual rate of 11.80% for reaffirmation agreements or priority stipulations in cases filed during the week of October 6, 1980.

### (f) *Computation of Annual Percentage Rate*

■ From the standpoint of practicality the only feasible method of providing that over a period of time a secured creditor will receive the future equivalent of the present value of the collateral in a Chapter 13 plan is to use an add–on method of calculating interest because it is essential that a claim be filed and allowed in the gross amount of the equivalence and that the records of the Standing Trustee, the debtor and the secured creditor all show the same figure. The most feasible method of computing the periodic payments required is to use the tables which have been programmed into the computer of a finance company. The Court was not able to find an inexpensive compilation of amortization or annuity ta-

bles which shows the stated interest rate, the annual percentage rate, and the current and cumulative principal and interest payments using a straight line accounting method.

The annual percentage rate is the heart of all reaffirmations and stipulations. It is the effective interest rate which the debtor will pay and is calculated as follows:

1. Take the principal amount of money advanced,
2. Add to that simple interest for the duration of the plan (the stated rate times the number of years),
3. Divide the total of the interest and principal by the number of months in the plan, which will produce a constant monthly payment,
4. Apply the Rule of 78's or other rebate formula to the total finance charge to determine how much earned interest is allocable to that month. Subtract that amount from the monthly payment. The remainder is a principal payment,
5. Subtract the principal payment for each month from the principal balance,
6. Repeat step 5 as many times, including step 5 itself, as there are periodic payments,
7. Add together all of the separate principal balances,
8. Divide the total produced in step 7 into the total amount of simple interest found in step 2.

2. Maximum annual percentage rate permissible under the principles of *In re Willis*, 80 B 7780, by week of petition filing

| 1980 Week of Filing | Average Auction 3 Month Treasury Bills | Maximum Annual Percentage Rate |
|---|---|---|
| June 24 | 7.08 | 7.58 |
| June 30 | 8.15 | 8.65 |
| July 7 | 8.21 | 8.71 |
| July 14 | 8.17 | 8.67 |
| July 21 | 7.88 | 8.38 |
| July 28 | 8.22 | 8.72 |
| August 4 | 8.88 | 9.38 |
| August 11 | 8.72 | 9.22 |
| August 18 | 9.41 | 9.91 |
| August 25 | 10.03 | 10.53 |
| September 1 (8/29) | 10.12 | 10.62 |
| September 8 | 10.06 | 10.56 |
| September 15 | 10.64 | 11.14 |
| September 22 | 10.46 | 10.96 |
| September 29 | 11.52 | 12.02 |
| October 6 | 11.30 | 11.80 |
| October 13 (10/10) | | |
| October 20 | | |
| October 27 | | |
| November 3 | | |
| November 10 | | |
| November 17 | | |
| November 24 | | |
| December 1 | | |
| December 8 | | |
| December 15 | | |
| December 22 | | |
| December 29 | | |

The result found in step 8 will be the true interest rate paid by the debtor. It will be in a range between 1½ and 2 times the amount of the stated interest rate, depending primarily on the rebate method used and the duration of the payments. The reason for this is that the average amount borrowed will be slightly more than ½ the initial loan because of the periodic repayments of principal. Stated differently, all of the money could be considered as being borrowed one–half of the time, or one–half of the money could be considered as being borrowed all of the time. (A person who understands algebra can combine steps 5 and 6).

Tables and computer programs have simplified the process of establishing the annual percentage rate. Unless they specify otherwise, the probabilities are that the figures shown are calculated on the basis of the Rule of 78's.

### (g) *Establishment of Equivalence*

Many courts have established the future equivalence of present value by formula, such as present value plus 9% interest for three years. The most serious problems with this approach will develop in Chapter 13 plans.

The Chapter 13 Standing Trustee can pay only allowed claims. A formula value is not sufficient for him to use, and it must be translated into dollar terms. Probably there is no Standing Trustee with clerks sufficiently trained so that they can convert a formula into a fixed dollar amount. Also it is necessary that the creditor and the debtor agree on the amount. It might be that the parties between themselves would agree to accept any figure established by the Standing Trustee, which would provide only a temporary palliative. At some point payments from the Standing Trustee to the secured creditor will begin to exceed the credit which the creditor shows on its books. At that time it will begin to refund to the Standing Trustee all of the payments which represent interest, and the reconciliation of records will present tremendous burdens upon the office of the Standing Trustee.

Furthermore, stipulations with secured creditors subordinate unsecured creditors until the stipulated sums have been paid. A substantial question of due process arises if the Court should abandon, or permit the abandonment of, those procedures for claim allowance which have been provided by the Code.

The nagging problems arising in a Chapter 7 case probably will not surface until after the case has been closed. Thus they do not become problems of the Court but rather problems of the debtor caused by the Court. If the reaffirmation is approved as a dollar value of the collateral plus an interest allowance, it will be difficult to establish the deficiency because the formula will not have described the rebate method to be used, and the principal payments cannot be computed. What undoubtedly will happen in most instances is that the finance company will use a programmed formula based upon the Rule of 78's, so that the principal payments will be small and the effective interest rate will be somewhere between 15% and 25%.

### 6. *Discharge and Reaffirmation Hearings*

This Court is aware that some courts cause discharges to be issued shortly after a scheduled § 341 meeting of creditors and before a discharge hearing or reaffirmation hearing. This Court also is aware that under that arrangement discharges may be issued without a debtor ever being confronted by his creditors, an interim trustee or the Court, if the meeting of creditors is continued beyond the scheduled discharge date. No comment need be made other than to state that such is not the way that this Court understands that the Congress intended things to be.

This Court is aware that § 524(d) provides with respect to a discharge hearing, "the Court shall hold a hearing at which the debtor shall appear in person", but that there is no penalty provided by the Code for failure to appear. Most of the debtors in this district are hourly paid employees whose wages for one day may exceed their

entire discretionary income for a month, the balance of their pay being required for rent, food, clothing and other necessities. Under such circumstances this Court has not in the past and does not propose presently to apply any sanctions against a debtor whose attorney states that the debtor's attendance would create a hardship. It is expected that the debtor's attorney will attend the discharge hearing in any event.

■ Provided that the reaffirmation disclaimer has been signed by the debtor's attorney and also that the attorney represents to the Court that he has discussed the debtor's budget with him and that the attorney and the debtor agree that the debtor can maintain the reaffirmation payment schedule without undue pressure, the debtor's presence at the reaffirmation hearing will be excused upon the attorney's representation that attendance would create a hardship.

This Court's practice has been to hold discharge hearings and reaffirmation hearings concurrently, at which time the discharge is entered, with one copy of the discharge order being presented to the debtor and one to his attorney. The hearings are set for dates three to four weeks after receipt from the interim trustee of a no asset report, at such intervals that not fewer than 10 nor more than 20 will be scheduled for one time. The hearing is opened with a ten minute general discussion of the effect of a discharge and of a reaffirmation agreement, after which the cases are called individually. It is anticipated that the debtors will be able to continue to ask questions about the discharge and reaffirmation agreement, but that the Court will have few questions, if any. Reaffirmations containing the attorney disclaimer will be presented to the calendar clerk for signature by the Court off the bench. Reaffirmations not containing the disclaimer shall be accompanied by a motion slip requesting the setting of a valuation hearing.

This Court is aware that other Courts issue discharges prior to the discharge hearing and reaffirmation hearing, notwithstanding the Note to Interim Bankruptcy Rule 4002. This Court also is aware that in those other Courts reaffirmation agreements are being approved which were not entered before the discharge was issued, contrary to § 524(c)(1). It seems particularly unfortunate and ironic that false statements and back-dating of the associated documents should become prevalent just as the Bankruptcy Courts are on the threshold of gaining the respect and stature of independent courts.

## FINDINGS OF FACT

■ A valuation hearing was held in the instant case prior to the time that the foregoing principles were enunciated. It was stipulated that on June 10, 1980, the debtor, James R. Willis, (hereinafter "Willis"), entered into an installment contract to purchase a 1979 Buick Riviera from Warren Buick, Inc. The Court will take judicial notice of the fact that most dealers of General Motors Corporation manufactured cars write retail installment contracts and discount them to General Motors Acceptance Corporation. The contract called for payments of $256.04 in monthly installments commencing July 25, 1980. Willis made a payment of $256.04 on July 25 but has not made any other payments. On June 24, 1980, exactly two weeks after purchasing the car, Willis filed the instant petition for Chapter 13 relief.

The principal area of dispute between G.M.A.C. and Willis is over the issue of whether the Court should base its valuation of the car upon the N.A.D.A. guidebook, as it clearly would do if Willis had owned the car for one year before filing his petition, or whether the Court should use the contract value.

Willis testified that he had visited this agency on two prior occasions before making his purchase and also that there were two other Buicks similarly priced at the Warren dealership. He did not testify about when he first considered filing a Chapter 13 petition, nor was there any representative from Warren Buick to testify about statements which Willis might have made to him.

To be specific with reference to the current posture of the case, it has been presented as a motion to vacate the confirmation of the debtor's plan. The attorney for G.M.A.C. was present at the confirmation hearing, and the debtor's attorney presented a priority stipulation signed by the debtor and by G.M.A.C. placing a value of $12,033.38 on the car. The N.A.D.A. Guide which was on the bench showed a wholesale value for the car of $7,600 and a retail value of $8,650. The Court rejected the stipulation as constituting an excessive present value and also an excessive interest charge.

Whenever an item is to be valued by a court, the court will obtain the best evidence available, consistent with the expense of obtaining it. The market value of an item is what a willing buyer will pay and a willing seller will accept. Used car guides are a form of hearsay declaration of what other buyers were paying and other sellers were receiving for similar cars during a period shortly before publication. In the instant case, however, we have a better gauge of what a willing buyer would pay and a willing seller would accept. We have the price to which Willis and Warren agreed only 14 days before the filing. Neither was under any compulsion to buy or to sell.

There is no evidence that anything happened to this particular car between June 10, 1980 and June 24, 1980, nor is there any evidence that anything occurred during those two weeks which would affect the prices of used cars generally. Therefore, we find that the value of the Buick in question on June 24 was the same as on June 10, and in each case it was $9,800.

The deferred payment price of $12,289.52 included a finance charge of $3,755.22. Applying the Rule of 78's to that amount we find that of the first month's payment, 53/1431, or $139.08, represented earned interest; $3,616.14 is to be rebated, leaving a principal balance of $8,673.38 before allocation of the payment of $256.04 on July 25,

which breaks down into $139.08 interest and $116.96 principal. Deducting $116.96 from the principal balance of $8,673.38 leaves a debt of $8,556.42 owed to G.M.A.C. by Willis. That entire amount is secured because we have found the car to have a value of $9,800, considerably in excess of the indebtedness secured.

The Court will approve a priority stipulation of $8,556.42 plus 53 months interest at an annual percentage rate not to exceed ½ of 1% over the June 23, 1980 average auction rate of 3 month United States Treasury Bills,[3] provided that the stipulation complies with the other principles set forth in this opinion.

§ 1330(a) of the Code provides for revocation of an order of confirmation if the order was procured by fraud. There has been no allegation nor evidence of any fraud in the instant case. It appears that both parties acted in good faith in presenting the stipulation for a priority order and that neither of them had any reason to believe that the Court would reject it *sua sponte*.

IT IS ORDERED THAT the motion to vacate the confirmation be denied.