**In re Billy Wayne CAUDLE and wife, Dola Myrie Caudle, Debtors.**

**Bankruptcy No. 81–20328.**

United States Bankruptcy Court, W. D. Tennessee, W. D.

May 6, 1981.

Ellen E. Fite, Memphis, Tenn., for debtors.

Gary L. Jewel, Memphis, Tenn., for Memphis Bank & Trust Co.

MEMORANDUM ORDER RE "OBJEC-
TION TO CONFIRMATION OF
DEBTORS' CHAPTER 13 PLAN"
FILED BY MEMPHIS BANK AND
TRUST COMPANY

DAVID S. KENNEDY, Bankruptcy
Judge.

This matter came on to be heard on April 28, 1981, upon the written "Objection To Confirmation Of Debtors' Chapter 13 Plan" filed by Memphis Bank and Trust Company ("Objector").

This is a case of first impression for this Court.

After hearing evidence and argument of counsel and consideration of the record in this Chapter 13 case, the Court makes the following findings of fact and conclusions of law:

## JUDICIAL HISTORY OF CASE AND FINDINGS OF FACT

On January 28, 1981, the above-named Debtors, Billy Wayne Caudle and wife, Dola Myrie Caudle ("Debtors"), filed a joint Chapter 13 case and plan seeking rehabilitation relief under the "Adjustment Of Debtors Of An Individual With Regular Income" under the Bankruptcy Reform Act of 1978. The Section 341(a) meeting of creditors was held on March 16, 1981; and the confirmation hearing was reset to March 30, 1981, due to the objector's "Objection To Confirmation Of Debtor's Chapter 13 Plan". By agreement of the parties, the confirmation hearing was eventually continued to April 28, 1981.

On January 18, 1980, the Debtors purchased a used 1975 Chevrolet Nova automobile from Shelton Harrison Chevrolet, Inc., for $2,735.28. The cash price was $3,780.00; a cash down payment and trade-in aggregated $1,858.00 leaving an unpaid balance of cash price of $1,931.00; miscellaneous charges aggregated $196.46 leaving an unpaid balance-amount financed in the amount of $2,127.46; the finance charge was $607.82; the annual percentage rate was *24.90%* leaving a total payment of $2,735.28 to be paid by the Debtors in 24 monthly installments of $113.97 each.

On March 8, 1980, the Debtors purchased a used 1978 Toyota automobile from Shelton Harrison Chevrolet, Inc. for $6,342.12. The cash price was $4,606.08; a cash down payment of $1,000.00 was made leaving an unpaid balance of cash price of $3,606.80; miscellaneous charges aggregated $748.88 leaving an unpaid balance-amount financed in the amount of $4,355.38; the finance charge was $1,986.74; the annual percentage rate was *25.95%* leaving a total payment of $6,342.12 to be paid by the Debtors in 36 monthly installments of $176.17 each.

Subsequently, Shelton Harrison Chevrolet, Inc. assigned the "paper" on both automobile loans to the objector herein.

Debtor, Billy Wayne Caudle ("Mr. Caudle"), is employed by Allen Iron Works, Inc., and works full time as a saw operator. He takes home approximately $170.00 per week. Debtor, Dola Myrie Caudle ("Mrs. Caudle"), has worked as a seamstress at United Uniforms, Inc., for approximately 9 years. Debtors' financial difficulties were brought about due to a recent substantial cut back in the hours Mrs. Caudle was able to work at her place of employment due to a contractual dispute between her employer and her union. Mrs. Caudle testified that she is now working full time again and brings home approximately $121.00 per week, but the loss of her paycheck for that period contributed to their present Chapter 13 wage earner filing. Debtors have three children and two grandchildren—*all* presently living with them in their mobile home which has a lien on it held by Commercial Credit Corporation. Two daughters of the Debtors are working and contributing to the family's living expenses. One daughter works thirty-two (32) hours a week at $3.35 an hour and contributes on primarily an "as needed" basis. The other daughter works forty (40) hours a week at $3.65 an hour and contributes approximately $60.00 per week. Mrs. Caudle and one daughter both work at United Uniforms, Inc. and drive the 1975 Nova to and from work. Mr. Caudle drives the 1978 Toyota and takes the other daughter to and from her place of employment on

his way to work and back home from work. Objector argued that one automobile is used solely by a daughter of the Debtors, but the Court has not heard any proof to support this bare allegation. Moreover, the proof is completely contrawise. The Court is convinced that both automobiles are essential for an effective rehabilitation and both automobiles are properly insured.

Debtors' modified plan (with the financial assistance of their two working daughters) proposes to pay $107.50 *per week* from future "family" income; that the holders of secured claims (with the exception of Singer)[1] shall retain the liens securing such claims, as provided under 11 U.S.C. Section 1325(a)(5)(B)(i), and to be paid, in pertinent part, as follows: Objector is to receive $110.00 per month re the 1978 Toyota loan (increased from $86.00 originally proposed) and $79.00 per month re the 1975 Nova loan (increased from $27.00 originally proposed). *All* creditors, both secured and unsecured, are to receive 100% payment under the Debtors' modified plan.

Objector asserts that its net claims are $4,518.93 (1978 Toyota loan) and $1,539.13 (1975 Nova loan). Neither the objector nor the Debtors introduced proof re the valuations of the two automobiles, although the Debtors expressed opinions that the automobiles are in good condition and "to them" are probably worth more than· the debts owed. No specific amounts re valuation were mentioned. Although not free from doubt, the Court will allow the objectors' two net claims as being fully secured in the amounts of $4,518.93 and $1,539.13. (The net claims include requested attorneys' fees for the objector, which fees this Court approves.)

Objector asserts that its two secured claims will not be paid in five years with the requested pre-Chapter 13 contractual A.P.R.s of 24.90% and 25.95% added to the allowed secured claims respectively at the proposed monthly payments under the plan. Objector further asserts that under 11 U.S.C. Section 506(b) and as a fully secured claimant, it should be allowed, ipso facto, pre-Chapter 13 contractual A.P.R. rates under the Debtors' Chapter 13 extension plan. The objector also asserts that the proposed monthly payments under the plan are not meaningful; and that the plan is not feasible under 11 U.S.C. Section 1325(a) and should, therefore, not be confirmed.

Objector effectively contends that it is an oversecured creditor and is entitled, under the circumstances, to its pre-Chapter 13 contractual A.P.R. rates (i. e. 24.90% and 25.95%) relying almost exclusively on 11 U.S.C. Section 506(b) (and completely ignoring, inter alia, the Chapter 13 provisions of 11 U.S.C. Sections 1322(b)(2) and 1325(a)(5)(B)(ii). Objector essentially asserts that in a consumer Chapter 13 case, if an "equity cushion" exists, however marginal or doubtful, 11 U.S.C. Section 506(b), ipso facto, entitles it to pre-Chapter 13 contractual A.P.R. rates, regardless of the amount of the contractual A.P.R. rate and notwithstanding other applicable provisions of Chapter 13 and the Bankruptcy Code.

Naturally, the parties have not been able to agree on an appropriate interest rate to be applied. Debtors have simply requested the Court to apply a fair and appropriate rate of interest under the exact circumstances, disputing the requested rates of the objector. Although the Court cannot propose a plan, under the circumstances, it shall endeavor to resolve the unfortunate dispute between the parties regarding the appropriate rate of interest to be applied in this particular case.

The following ultimate specific issues are presented for judicial determination in the instant case:

1. Should the Debtors' proposed modified Chapter 13 plan be confirmed under the circumstances?

2. Is the objector, under the facts and circumstances, entitled to post-bankruptcy contractual interest on its allowed secured

---

1. Debtors are surrendering the sewing machine to Singer in an effort to make their plan more feasible.

claims pursuant to 11 U.S.C. Section 506(b) and in accordance in the provisions of its pre-Chapter 13 A.P.R. contractual rates?

3. If the objector is not entitled to its pre-Chapter 13 contractual A.P.R. rates on its allowed secured claims, what interest, if any, is it entitled and how is that interest ("present value") determined pursuant to 11 U.S.C. Section 1325(a)(5)(B)(ii)?

## CONCLUSIONS OF LAW

The Constitutional grant of power to Congress to legislate on the subject of bankruptcies has long been considered the power to impair the obligations of contracts for an overriding purpose. *Hanover Nat. Bank v. Moyses*, 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113.

Chapter 13 of the Bankruptcy Reform Act of 1978 provides rehabilitation relief by "Adjustment Of Debtors Of An Individual With Regular Income", superceding Chapter XIII of the Bankruptcy Act of 1898.

At first blush, it might appear that Sections 506(b) and 1325(a)(5)(B)(ii) of the Bankruptcy Code are inconsistent.

### 11 U.S.C. Section 506(b)

The general rule is that post-bankruptcy interest is not allowed in ordinary bankruptcies and reorganizations. *Sexton v. Dreyfus*, 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244 (1911); *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 163, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946) ("Vanston").

There are, however, exceptions to the general rule in situations where: (1) the debtor ultimately proves to be solvent; and (2) the claimant's security itself produces income after the filing of the bankruptcy petition, in which case the post-bankruptcy income can be applied against post-petition interest on the main claim. *In re Kerber Packing Co.*, 276 F.2d 245, 246 (7th Cir. 1960); *In re New York, N.H. & H.R.R.*, 304 F.Supp. 1121 (D.Conn.1969) at 1129–30; see also *City of New York v. Saper*, 336 U.S. 328, 330, 69 S.Ct. 554, 555, 93 L.Ed. 710 (1949). Neither of these two exceptions is applicable to this case.

A third exception exists where there are special instances. The courts have awarded interest on a fully secured claim if the value of the security exceeds *both* the principal and interest due. *Vanston*, supra, 329 U.S. at 164, 67 S.Ct. at 240; *In re Macomb Trailer Coach, Inc.*, 200 F.2d 611, 613 (6th Cir.), cert. denied sub nom. *McInnis v. Weeks*, 345 U.S. 958, 73 S.Ct. 940, 97 L.Ed. 1378 (1953); see generally Annot., 27 A.L. R.2d 586 (1953); *Oppenheimer v. Oldham*, 178 F.2d 386 (5th Cir. 1949). For example, if a bankruptcy trustee liquidates and sells collateral and an equity exists, the secured creditor is entitled to principal and interest *to the date of payment* including payment of other reasonable costs.

The Supreme Court in *Vanston*, 329 U.S. at p. 165, 67 S.Ct. at 241 stated:

> "It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a *balance of equities* between creditor and creditor or between creditors and the debtor." (Emphasis added.)

The text of Section 506(b) of the Bankruptcy Code, in pertinent part, provides:

> "To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, *interest* on such claim, and any reasonable fees, costs, or charges provided under the agreement under which such claim arose." (Emphasis added.)

The codification of law embodied in 11 U.S.C. Section 506(b) provides definitively and clearly that a creditor with an oversecured claim is entitled to interest to the date of payment where the security is sufficient to cover *both* principal and interest. This is not, however, innovative.

S.Rep.No.95–989, 95th Cong. 2d Sess. 68, U.S.Code Cong. & Admin.News 1978, 5787, 5854 states as follows re Section 506(a) and (b):

"Subsection (a) of this section separates an undersecured creditor's claim into two parts: He has a secured claim to the extent of the value of his collateral; and he has an unsecured claim for the balance of his claim. The subsection also provides for the valuation of claims which involve setoffs under section 553. While courts will have to determine value on a case-by-case basis, the subsection makes it clear that valuation is to be determined in light of the purpose of the valuation and the proposed disposition or use of the subject property. This determination shall be made in conjunction with any hearing on such disposition or use of property or on a plan affecting the creditor's interest. To illustrate, a valuation early in the case in a proceeding under sections 361–363 would not be binding upon the debtor or creditor at the time of confirmation of the plan. Throughout the bill, references to secured claims are only to the claim determined to be secured under this subsection, and not to the full amount of the creditor's claim. This provision abolishes the use of the terms 'secured creditor' and 'unsecured creditor' and substitutes in their places the terms 'secured claim' and 'unsecured claim'.

"Subsection (b) codifies current law by entitling a creditor with an oversecured claim to any reasonable fees (including attorney's fees), costs, or charges provided under the agreement under which the claim arose. These fees, costs and charges are secured claims *to the extent that the value of the collateral exceeds the amount of the underlying claim.*" (Emphasis added.)

3 *Collier On Bankruptcy*, Para. 506.05 (15th Ed. 1979), provides as follows:

"Section 506(b) represents a Senate amendment to a House version which, while not substantially different from the Senate version, made the entitlement to interest and reasonable fees subject to collectability under local law. The Senate prevailed in its view that there should be no such limitation. *To the extent that an allowed secured claim is secured by property the value of which is greater than the amount of the claim, the secured claim holder is entitled not only to interest but also to reasonable fees, costs or charges as set forth under the agreement, and this, in the Senate view, would include attorneys' fees. Such interest, fees and costs would be recoverable from the collateral after any recovery made by the trustee under section 506(c).* Section 506(b) reads as follows: (subsection omitted) (Emphasis added).

"The notion in section 506(b) that interest may be allowed on a secured claim is not innovative so far as case law is concerned although nothing in the 1898 Act spoke to it as clearly as does section 506(b)."

██ Assuming arguendo that equities exist in both automobiles in the instant case, the objector would only be entitled to interest to the extent the allowed secured claims are secured by the automobiles, the values of which, after recovery under subsection (c) of Section 506, are greater than the amount of such claims.

██ Under the facts and law of this Chapter 13 case, the objector's reliance on this Section is completely misplaced. Section 506(b)'s impact is primarily found in situations where collateral is sold by a debtor or bankruptcy trustee. Here, the collateral is being "used" under 11 U.S.C. Section 363. A Chapter 13 extension plan, inter alia, may modify the rights of holders of secured claims other than a claim secured only by a secured interest in real property that is the debtor's principal residence. 11 U.S.C. Section 1322(b)(2). In Chapter 13 cases the compensation to which the holder of a secured claim is entitled is the "present value" under Section 1325(a)(5)(B)(ii), which takes into account the discount of money to be received in the future. It is not interest of the contractual kind contemplated under 11 U.S.C. Section 506(b) and requested by the objector.

*11 U.S.C. Section 1325(a)(5)(B)(ii)*

A Chapter 13 plan shall be confirmed if the requirements of 11 U.S.C. Sections

1322(a)[2] and 1325(a)(1) through (6) are satisfied.

11 U.S.C. Section 1325(a)(1) through (6) provides as follows:

"(a) The court shall confirm a plan if—

(1) the plan complies with the provisions of this chapter and with other applicable provisions of this title;

(2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;

(3) the plan has been proposed in good faith and not by any means forbidden by law;

(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder; and

(6) the debtor will be able to make all payments under the plan and to comply with the plan."

As stated, 11 U.S.C. Section 1325(a)(5)(B) provides that the plan may be confirmed as to the holder of a secured claim if:

"(i) the plan provides that the holder of such claim retain the lien securing such claim."

As stated, the text of Section 1325(a)(5)(B)(ii), in pertinent part, provides:

"(5) with respect to each allowed secured claim provided for by the plan—

\*  \*  \*  \*  \*  \*

"(B)(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim."

Section 1325(a)(5)(B)(ii) mandates that a holder of a secured claim receive under the plan "value as of the effective date of the plan" equal to the allowed amount of the claim. (There is no mention of the contractual interest suggested by the objector herein.) The import of the emphasized language is construed as the "present value" as of the date of the confirmation inclusive of deferred cash payments payable over time in installments equal to the aggregate amount of the claim. See, 5 *Collier On Bankruptcy*, Para. 1325.01(2) at pp. 1325–26 (15th Ed. 1979).

■ To understand Section 1325(a)(5)(B), it is necessary to know that the allowed amount of a secured claim is the value of the property securing the claim. 11 U.S.C. Section 506. What the statute thus means is that as to a secured creditor the Chapter 13 plan can be confirmed if the plan provides that the holder of a secured claim retain its lien and be paid the value of its collateral as of the effective date of the plan. See, *In re Lum*, infra.

■ The courts have held that a plan complies with the requirements of 11 U.S.C. Section 1325(a)(5)(B)(ii) if it provides that the secured holder will receive the "present value" of his allowed claim (not, ipso facto, contractual interest) which takes into account the discount of money to be received in the future. Where, as here, the objector is to be paid in installments over time, the objector is entitled to a percentile interest factor, to protect it from loss caused by its being paid over a period of

---

2. Section 1322(a) specifies what a Chapter 13 plan must do (i. e. it contains the mandatory provisions). (Section 1322(b) specifies what a Chapter 13 plan may do (i. e. it contains the permissive provisions.)

time. Cf. 11 U.S.C. Section 1129; See, House Report No. 95–595, 95th Cong. 1st Sess. 412 (1977), U.S.Cong. & Admin.News 1978, pp. 5787, 6368.

■ With reference to determining the appropriate rate of interest on a secured claim, the courts have endorsed basically two methods of calculating such interest: (1) the current legal rate of interest allowable by state law and (2) the rate of interest on tax liabilities fixed by 26 U.S.C. Section 6621.

The following cases are cited as examples of these methods:

In *In re Crockett*, 3 B.R. 365 (Bankr.Ct.N.D.Ill.1980), the Court held that in order to give the creditor "present value", an incremental adjustment of 9% per annum must be added to the fair market value of the secured claim notwithstanding the contractual rate. Specifically, at p. 368, the Court stated:

"A convenient yardstick to determine necessary incremental adjustments is the current legal rate of interest. The current general interest rate allowable in Illinois is 9% per annum. Ill.Rev.Stat., ch. 74, Sec. 4, as amended by P.A. 81–1097, effective Nov. 8, 1979, 7 Ill.Legis. Serv.1979 (West)."

In *In re Lum*, 1 B.R. 186 (Bankr.Ct.E.D.Tenn.1979), the Court held in a consumer Chapter 13 case that a 10% interest rate was appropriate for deferred cash payments (even though the then prevailing prima rate was greatly in excess of 10%). Specially, at p. 188, the Court stated:

"The compensation to which the creditor is entitled is the present value that takes into account the discount of money to be received in the future. *It is not interest of the contractual kind.* Interest on a secured claim stops with the filing of a petition in bankruptcy except in some instances. 11 U.S.C. Section 506. Nevertheless, the application of a percentage to the balance to be paid in the future is one method of allowing for the risk and loss of use resulting from the postponement of payment. The question is what percentage rate the court should allow. (Emphasis added.)

"Where there is no contractual rate of interest courts sometimes allow the 'legal' rate as the proper payment for the loss of use of money. C. McCormick, Handbook of the Law of Damages, Section 51 at 209 (1935). The legal rate is the rate allowed on judgments. In Tennessee that is an effective rate of 8% per annum. Tenn. Code Ann. Section 47–14–121 (1979 Repl. Vol.)

"Of course, in this case there was a contract. The court has not discovered in it any stated rate of interest, though it does show that the 'finance charge' produced an 'annual percentage rate' of 16.8%. The court also notes that this was an installment sales contract between a seller and a buyer where the seller in effect lends the purchase money but the buyer does not receive any money. The transaction can also be viewed as a sale where the seller charges more by means of a 'time-price differential', because of the installment payment. Furthermore, *the Court is not aiming to produce a lender's profit but only to protect the creditor from loss caused by its being paid over a period of time.* (Emphasis added.)

"The court's determination can at best be a rough approximation. But, having considered the creditor's argument, its contract, and the Tennessee statutes, being not wholly removed from economic concerns, and being required to make a decision, it is the opinion of the court that GMAC is entitled to be paid an effective rate of interest of 10% per annum on the unpaid balance of its $5,000.00 allowed secured claim.

"For purposes of this memorandum and orders pursuant to it 'effective rate of interest' is defined in Tenn.Code Ann. Section 47–14–102(2) (Repl.Vol.1979). Since the payments are to be made monthly the trustee may determine and allocate the payments by the 'actuarial method'. See Tenn.Code Ann. Section 47–14–102(5) (Repl.Vol.1979)."

*In re Lum*, supra, has been cited with approval by many courts. See, for example,

*In re McLeod*, 5 B.R. 520 (Bkrtcy.N.D.Ga. 1980), a Chapter 13 case, where the court held that the appropriate time value was 10% per annum and declined to measure the time value at 26.29% per annum, the contractual annual percentage rate, urged by the creditor, G.M.A.C.

In *In re Ziegler*, 6 B.R. 3, 6 BCD 194 (Bkrtcy.S.D.Ohio 1980), the Court allowed a "discount rate" of 12% per annum computed under the technique of the Internal Revenue Code, 26 U.S.C. Section 6621. Specifically, in *Ziegler*, the Court stated at pp. 195–196 as follows:

"(w)e reach finally the question of what the creditor should be given to compensate it for the receipt of the amount of its claim over a period of time. 5 *Collier On Bankruptcy* (15th ed. 1979) 1325–26 puts it thus:

'An appropriate discount factor must be arrived at by the court, so as to fairly discount value proposed to be given in the future on account of the allowed secured claim.'

"The text then goes on to say:

'The simplest method of equating the present value of deferred future payments with the amount of the allowed secured claim is to propose interest payments over and above the fact amount of the allowed secured claim at whatever interest rate is equivalent to the discount rate selected by the court or agreed upon by the parties.'

"We find this 'simplest method' appealing and adopt it. There remains then the determination of the discount rate to be applied. The parties have not agreed upon one and it is therefore left to us to select one.

"In this connection the following provision of the Internal Revenue Code has come to our attention (26 U.S.C. Section 6621):

'Sec. 6621 (1954 Code). (a) In General—The annual rate established under this section shall be such adjusted rate as is established by the Secretary under subsection (b).

(b) Adjustment of Interest Rate—The Secretary shall establish an adjusted rate of interest for the purpose of subsection (a) not later than October 15 of any year if the adjusted prime rate charged by banks during September of that year, rounded to the nearest full percent, is at least a full percentage point more or less than the interest rate which is then in effect. Any such adjusted rate of interest shall be equal to the adjusted prime rate charge—by banks, rounded to the nearest full percent, and shall become effective on February 1 of the immediately succeeding year. An adjustment provided for under this subsection may not be made prior to the expiration of 23 months following the date of any preceding adjustment under this subsection which changes the rate of interest.

(c) Definition of Prime Rate—For purposes of subsection (b), the term 'adjusted prime rate charged by banks' means 90 percent of the average predominant prime rate quoted by commercial banks to large businesses, as determined by the Board of Governors of the Federal Reserve System.'

"The rate currently in force pursuant to this provision, having become effective February 1, 1980, is 12%. The rate itself and the technique provided by the statute for deriving the rate, seems to us to provide an equitable solution to determining 'an appropriate factor' to be applied in the 11 U.S.C. Section 1325(a)(5)(B)(ii) situation. It is reasonably responsive to current economic conditions, is subject to periodic revision, yet is not an unfair burden on Chapter 13 debtors. We therefore, adopt the technique of 26 U.S.C. Section 6621 and the current rate of 12%. It will be understood that we mean 12% per annum simple interest."

In *In re Smith*, 4 B.R. 12, 6 BCD 424 (Bankr.Ct.E.D.N.Y.1980), the court allowed a "discount rate" equivalent to the contract rate (12.68%) although it should be noted that the Court relied upon the provisions of Section 1325(a)(5)(B)(ii) in reaching its conclusion re "present value".

In *In re Anderson*, 6 B.R. 601 (Bkrtcy.S.D.Ohio 1980), the court allowed a interest factor of 9.82% per annum arising out of a security agreement providing for a 17.2% A.P.R. and stated at p. 610 as follows:

"*If the rate proposes to pay a secured claim (in addition to the valuation of the collateral) finance charges greater than current market or 'discount rates', confirmation of the plan would be denied. If the rate proposed is less than the consensual contract finance charge, the court must determine that the rate is reasonable in light of the particular facts*; such as: the type of collateral involved; the likelihood of appreciation or depreciation in value; the immediate liquidation potential; the motivation or purpose of the secured claimant in not cooperating in a debt adjustment; the length of the proposed extension compared to the termination rate of the original contract between the parties; and, the percentage amounts of the dividends to be paid also to unsecured claims (including the unsecured portion of secured creditors' claims). Again adverting to reaffirmations and redemptions, *the most acceptable and feasible rate to be proposed by a debtor would approximate the consensual contract rate, assuming it was in fact a reasonable consensual rate and not imposed by the lender to exploit a naive, unsophisticated debtor or a debtor in desperation. Any reasonable proposal would be far more advantageous to all parties than capricious litigation.*" (Emphasis added.)

## CONCLUSIONS

The Court has considered carefully the Debtors' budget and available income from all sources derived and concludes under a totality of the particular facts and circumstances that the Debtors have proposed their bona fide, good faith, best effort and that their modified plan, notwithstanding the allegations of the objector is meaningful, feasible and reasonable based on their exact circumstances. See, S.Rep.No.95–989, 95th Cong. 2d Sess. 13, reprinted in (1978) U.S.Code Cong. & Ad.News 3, 15; see also proposed Senate No. 863, Bankruptcy Amendments Act of 1980, introduced on April 2, 1981.

■ Under the particular circumstances of this case and relying upon *In re Ziegler*, supra, the Court should allow the objector, in this case, an interest rate for each loan in question of 12% per annum computed under the technique of the Internal Revenue Code, 26 U.S.C. Section 6621. Although the allowed 12% falls far short of the objector's requested pre-Chapter 13 A.P.R. rates of 24.90% and 25.95%, the Court finds under the particular facts and proof adduced that the requirements of 11 U.S.C. Section 1325(a)(5)(B)(ii) have been met by the Debtors. The objector's requested pre-Chapter 13 rates of 24.90% and 25.95% are, inter alia, unreasonable and inequitable in light of the particular facts and would jeopardize an otherwise good plan to the detriment of other affected creditors and particularly the holders of unsecured claims. In a liquidation Chapter 7 case, holders of unsecured claims would receive nothing.

The Court further concludes that all the remaining requirements of 11 U.S.C. Sections 1322(a) and 1325(a) have been met; and good cause exists to approve a plan longer than three years, but less than five years pursuant to 11 U.S.C. Section 1322(c).

The Court notes that the Debtors are honest, hardworking and deserving. Their plan is austere and ambitious. If they default under the terms of the plan, of course, the objector may file an appropriate motion to convert or dismiss the Chapter 13 case under 11 U.S.C. Section 1307(c) or file a complaint for reclamation under 11 U.S.C. Section 362(d) or file a motion for adequate protection under 11 U.S.C. Section 363(e).

Based on all the foregoing, the entire record herein and equitable principles under 28 U.S.C. Section 1481, the Court denies the objector's objection to the Debtors' modified plan.

IT IS, THEREFORE, ORDERED:

1. That the objection to confirmation of the Debtors proposed modified plan filed by

the Memphis Bank and Trust Company based on 11 U.S.C. Section 1325(a) is hereby denied.

2. That the allowed secured claim re the 1975 Chevrolet Nova loan is $1,539.13 to be paid under the Chapter 13 modified plan at the rate of $79.00 per month, plus the time value of said sum computed at the rate of 12% per annum in this case.

3. That the allowed secured claim re the 1978 Toyota loan is $4,518.93 to be paid under the chapter 10 modified plan at the rate of $110.00 per month, plus the time value of said sum computed at the rate of 12% per annum in this case.

4. That the Debtors are to continue to maintain proper insurance on said two automobiles during the term of the plan.

5. That the Chapter 13 Trustee is hereby directed to make payments to Memphis Bank and Trust Company in accordance and consistent with the foregoing.

6. A separate order will be entered confirming the Debtors' Chapter 13 modified plan in accordance and consistent with the foregoing and the entire record herein.