**In re Johnny Joe FISHER, Judith Martina Fisher, Debtors.**

**In re John Joseph LORENCE, Lois Irene Lorence, Debtors.**

**Bankruptcy Nos. 81–40886, 83–40075.**

United States Bankruptcy Court, D. Kansas.

April 15, 1983.

Lloyd C. Swartz, Topeka, Kan., Trustee.

Michael P. Haney, Trial Atty., Tax Division, Dept. of Justice, Washington, D.C., for I.R.S.

### ORDER

JAMES A. PUSATERI, Bankruptcy Judge.

In these chapter 13 proceedings, at issue is the discount rate the trustee has proposed the IRS should receive on its secured claim. The IRS has filed a motion objecting to the discount rate currently awarded in this Court, asserting it is entitled to the rate of interest established by 26 U.S.C. § 6621.

*In Re Fisher*

The debtors filed a chapter 13 bankruptcy petition on November 10, 1981. The plan was confirmed on May 20, 1982 without IRS objection. The debtors filed a motion to modify their plan after confirmation on September 27, 1982 and an issue arose with the IRS concerning setoff of tax refunds and the extent of the IRS secured claim.

On November 15, 1982 the Court entered an order allowing the IRS to setoff against the tax refunds. Also on November 15, 1982 the Court entered an order approving the modification of the debtors' plan. After an extension, the IRS appealed the confirmation order on December 14, 1982 designating the issue as whether the debtors' modification was proposed in good faith under 11 U.S.C. § 1325(a)(3). On December

7, 1982 the trustee objected to the IRS claim and on January 18, 1983 the Court allowed the claim as an $8,000 secured claim plus a 10% discount rate, a priority claim of $2,098.09, and an unsecured claim of $16,071.28. On January 27, 1983 the IRS filed a response to the trustee's objection and objected to the 10% discount rate, requesting as a discount rate the interest rate provided in 26 U.S.C. § 6621. A memorandum did not accompany the response. The Court requested the IRS to file a memorandum by March 16, 1983 and ....

At no time prior to January 27, 1983 did the IRS request a discount rate other than the prevailing rate granted to secured creditors.

### In Re Lorence

The debtors filed their chapter 13 petition on February 3, 1983. The applicable discount rate in this case is based on the January 23, 1983 sale of 52 week Treasury Bills which rate was 8.65%.

On March 18, 1983, the IRS objected to the discount rate applicable in this Court and requested the interest rate provided by 26 U.S.C. § 6621.

### CONCLUSIONS OF LAW

Section 1325 provides the Court shall confirm a plan if "the value as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim ...." 11 U.S.C. § 1325(a)(5)(B)(ii). This requires that the payments to the secured creditor have a "present value" equal to the creditor's allowed secured claim. 5 Collier on Bankruptcy ¶ 1325.01[2][E][2][A][2] (15th Ed.1982).

### I.  Present Value

"Present value" or the "time value of money" is not a legal concept, but rather it is a term of art in the financial community. It simply means that a dollar received today is worth more than a dollar to be received in the future. To compensate the creditor for not receiving its money today, the debtor is charged an additional amount of money. The charge is based on a rate of interest called a "discount rate." The discount rate is used to calculate how much the creditor should be paid so it will have the same amount of money in the future as it would have had if it did not have to wait to be paid. See generally E. Grant & W. Ireson, Principles of Engineering Economy 35 (4th Ed.1964). A "discount factor" is computed by an algebraic formula using the discount rate. The factor is multiplied times the future payments to reveal what the stream of future payments is worth today.

> To the lender (investor) the loan (investment) is the amount necessary to secure the promise of the future payment or series of payments, with interest at the given rate. The investment necessary to secure the promise of the future payment or payments is the present worth of the future payments.

E. Grant & W. Ireson, Principles of Engineering Economy 40 (4th Ed.1964).

### II.  Determination of Discount Rate

A discount rate is made up of two components, a "riskless" rate of interest, and an additional measure of interest to compensate for the risk of the transaction. A universally accepted riskless rate of interest is the interest paid on United States government bonds or bills, because they are not considered subject to default. See In Re Willis, 6 B.R. 555, 6 B.C.D. 1101, 1104 (Bkrtcy.N.D.Ill.1982). See generally J. Weston & E. Brigham, Managerial Finance 244–71 (6th Ed.1978); R. Higgins, Financial Management Theory and Application 51 (1977). The Court believes the best indicator of the risk free rate of interest for the purposes of a chapter 13 plan is the sale of Treasury Bills. These are auctioned at least monthly and are short term investments. These short term investment devices are subject to and reflect the changes in our volatile economy because they are auctioned frequently.

The second component of a discount rate is "risk." There is a divergence of opinion concerning the extent to which the risk

component should be included in computing a chapter 13 discount rate.

Some commentators and cases suggest that deferred payments are tantamount to a coerced, or involuntary loan, and thus the discount rate ought to reflect the rate of return that would be earned by the creditor making "a loan to a third party with similar terms, duration, collateral and risk of default." 5 Collier on Bankruptcy ¶ 1129.03 (15th Ed.1982); Comment, Bankruptcy Reform Act of 1978: Chapter 13 Cramdown of the Secured Creditor, 1981 Wisc.L.Rev. 333, 354 [hereinafter, Comment: Cramdown]. These commentators argue "the discount rate should reflect a market perception of the risk involved in the 'coerced loan.'" Comment: Cramdown, 1981 Wisc.L.Rev. at 354. The relevant question under this theory is what rate of return would the creditor receive in making this type of loan to a non-chapter 13 debtor with similar terms, risk, etc.? Id. Thus, they argue, a contract rate of interest is the best reflection of a coerced loan discount rate.

### III.  Coerced Loan Theory

Even the advocates of the coerced loan theory admit the contract rate of interest is subject to adjustments because the interest rate in a contract is composed of the risk free rate of interest plus a risk component cost of administration, profit and other elements not necessarily applicable in the context of a chapter 13.

For example, part of a secured creditor's risk component is the depreciation of collateral.

This risk, however, would not apply to the portion of a claim that is allowed as secured because the secured creditor is entitled to adequate protection from any post petition depreciation in collateral value.

Comment, Cramdown, 1981 Wisc.L.Rev. at 356 n. 130. A contract rate that reflects a risk premium to compensate for the possibility of an unsecured deficiency must be reduced "to reflect the decreased risk of an unsecured deficiency" in the chapter 13 based on 11 U.S.C. § 362(d). Id.

Built into a secured creditor's risk component are the transactional costs of being a lender in a society where all debts are not paid. The cost of collection and the risk of nonpayment necessitate charging a debtor interest to compensate the creditor for the costs of collection through judicial or nonjudicial means in the event of default. See Leff, Injury, Ignorance and Spite—The Dynamics of Coercive Collection, 80 Yale L.J. 1 (1970).

In chapter 13, however, attendant costs of collection such as garnishment, attachment, self-help repossession, and the draw backs of attempting to collect such as racing to the courthouse to garnish a debtor's wages before other creditor's garnish wages are eliminated. The costs of finding the debtor, obtaining a judgment, ordering him into court to aid in execution, keeping track of the debtor and having little or no control over a judgment-proof debtor (high risk debtor) and little or no means to force payment on a regular basis from someone who does not want to, or cannot pay are eliminated. There are also no costs of dunning or billing in chapter 13.

The chapter 13 debtor has voluntarily submitted a portion of his earnings to the trustee to satisfy his debts. The creditors share in his payments. There is no race to garnish. The debtor has incentive to make payments and during the life of the chapter 13 plan, the creditor is assured that 100% of the claims owed to secured creditors by a complying debtor will be paid. Outside of bankruptcy, the creditor has no such assurance. Roughly speaking, approximately ⅔ of those chapter 13 plans filed in this Court during 1979 have successfully been completed. In those completed plans the creditor will have been paid. In those plans not successfully completed the relationship will revert back to the pre-chapter 13 status including reinstatement of those risk components absent during the chapter 13. The Court *cannot* confirm a chapter 13 plan if the plan is not feasible. 11 U.S.C. § 1325(a)(6). In each confirmed plan, the Court has found the debtor can and will comply with the plan requirements. If the

Court does not believe the debtor can or will comply with the plan, the Court cannot confirm the plan. Thus each confirmed plan carries with it a statutory presumption it will be completed. Given this presumption, how can it be argued that payment of chapter 13 claims are tantamount to involuntary loans in the marketplace? And even if payment of chapter 13 claims are tantamount to nonbankruptcy, involuntary loans, what interest rate would a creditor charge a debtor when there was a legal presumption and finding by a court that the debtor would make all payments under the loan agreement?

> It is arguable,
> that an intelligently developed plan, which often by necessity offers little to the unsecured creditor, may result in a debtor who is better able to meet his obligations than is the average debtor to whom a particular creditor normally lends. A plan may result in the debtor having substantially less unsecured debt and, more importantly, a plan will detail a specific budget along with a particular provision for setting aside a sufficient amount of future income to fund plan payments. These factors, along with the debtor's court-imposed obligation to fund the plan, might make plan payments less risky than the loan repayments of an average debtor.

Comment, Cramdown, 1981 Wisc.L.Rev. at 357, n. 131. The debtor is subject to § 341 and Rule 205 examination. Outside of bankruptcy, it is highly unusual for a creditor to be given the ability on a loan to examine a debtor under oath as to his budget and ability to repay.

In addition, the element of profit is built into the interest charged by creditors. A creditor profits from the interest it charges. A creditor might charge a higher rate of interest on top of the risk free interest rate to enhance its profit. As discussed infra, many courts have stated the discount rate is not intended to give *any creditor* a profit. Thus the element of profit should be removed from the contract rate, particularly in reference to the IRS which is not in the business of earning profits.

Most of the costs of administration of a "loan" in chapter 13 are handled by the chapter 13 trustee. The *debtor* (not the creditor) must pay the trustee an additional fee based on a percent of the funds the trustee distributes. In essence, the trustee is a collection agent for the creditor, but with many more powers than the average collection agent and with court and statutory backing. The debtor should not pay administration costs to both the trustee and the creditor, especially when the creditor's costs are greatly reduced by the presence of the trustee. To allow the element of administration costs to remain in the contract rate would be tantamount to charging the debtor twice for a single cost. Thus, most, if not all, costs of administration must be removed from the contract rate.

Finally, the Court questions the applicability of a coerced loan theory to the IRS. The IRS does not "lend" money. There are virtually no creditors similar to the IRS in the marketplace to whom the IRS can be compared. A contract rate of interest "contemplates a rate determined in a marketplace in which buyers and sellers are free to bargain." Comment: Cramdown, 1981 Wisc.L.Rev. at 356, n. 128. There is no bargain for the average taxpayer on the rate of interest charged by the IRS. It is set by statute based on a weighted average of the prime.

The IRS does not set its § 6621 rate of interest based on any of the advocated factors such as duration, collateral, and risk of default. The IRS has determined that its rate of interest must be high enough to deter tax evasion, restrict creative tax avoidance, and to compel timely tax payment and reporting. These are not marketplace factors.

Based on these considerations, a contract rate of interest must be adjusted to reflect what this Court perceives as much different elements of risk in chapter 13 than in the nonbankruptcy marketplace. The risks of a *chapter 13* coerced loan must be considered. The risks of a nonbankruptcy loan contain many elements foreign, in-

applicable, or inappropriate in the chapter 13 loan. The costs of the chapter 13 loan are significantly different than the costs of the nonbankruptcy loan. The element of profit is inappropriate in chapter 13. Even if the contract rate is the correct starting point in determining a proper discount rate, adjustments must be made to reflect the type of contract that is entered into by a debtor and creditor in chapter 13. Adjustments must be made for the elements of profit, administration costs, risk, industry transactional costs, costs of collection, the statutory element of risk based on 11 U.S.C. § 1325(a)(6), statutory adequate protection and voluntariness of chapter 13. What interest rate would the creditor charge a non-chapter 13 debtor if a profit is removed, and, inter alia, administration costs, risk, industry costs, transactional costs and collection costs were reduced and adequate protection assured? Furthermore, although the Court has its doubts, even if the IRS' § 6621 rate of interest accurately reflects a coerced loan/contract rate of interest, it too would be subject to adjustment in a chapter 13 case just like the other contract rates of interest.

*IV. Contract Rate Case Law*

Courts and commentators advocating the contract rate and criticizing the use of the treasury bill rate as a base have said the treasury bill rate:

> would establish a standard reflecting the credit worthiness of the chapter 13 creditor rather than the credit risk of the debtor.

*In Re Cooper,* 11 B.R. 391, 394, 7 B.C.D. 854 (Bkrtcy.N.D.Ga.1981). *Cooper,* however, is inconsistent with a prior opinion issued in the same case. In *In Re Cooper,* 7 B.R. 537, 7 B.C.D. 24 (Bkrtcy.N.D.Ga.1980) the court stated the purpose of a discount rate was not to generate a profit to the creditor. 7 B.R. at 542. Yet in the followup *Cooper* opinion, the court allowed a contract rate of interest as the discount rate. This contract rate contained elements of profit that are inappropriate in a chapter 13 discount rate, regardless of which method is used to arrive

at a discount rate. *In Re Benford,* 14 B.R. 157, 161, 8 B.C.D. 117, 5 C.B.C.2d 79 (Bkrtcy.W.D.Ky.1981); *In Re Klein,* 10 B.R. 657, 666, 4 C.B.C.2d 412, 416–17 (Bkrtcy.E. D.N.Y.1981); *In Re Lum,* 1 B.R. 186, 188, 5 B.C.D. 1039 (Bkrtcy.E.D.Tenn.1979); *In Re Johnson,* 8 B.R. 503, 505 (Bkrtcy.S.D.Tex. 1981).

In addition, this Court has not found a single contract rate case in which adjustments have been made to reflect the actual nature of the chapter 13 "loan." In *In Re Cooper,* 11 B.R. 391, 7 B.C.D. 854 (Bkrtcy.N. D.Ga.1981), an unadjusted contract rate of 25.98% was approved as the proper discount rate. In *In Re Clements,* 11 B.R. 38 (Bkrtcy.N.D.Ga.1981), an unadjusted contract rate of 14.34% was approved. In *In Re Kauffunger,* 16 B.R. 666 (Bkrtcy.D.N.J. 1981), the creditor's contracts called for interest at annual rates of 12.60 to 17.91%. Each unadjusted rate was approved by the court as the discount rate. In *In Re McMichen,* 23 B.R. 497, 7 C.B.C.2d 618 (Bkrtcy.N. D.Ga.1982), the creditor convinced the court that its contract rate of interest was outdated and that on the date of confirmation it would charge a 13% add-on interest rate allowing for up to 23.81% A.P.R. The court approved an unadjusted 22.55% contract rate as the discount rate. Even among the courts allowing a contract rate of interest, not all of the courts allow a creditor to prove a higher than contract rate. See *In Re Evans,* 20 B.R. 175, 9 B.C.D. 198 (Bkrtcy. E.D.Pa.1982). This Court is also aware of *Memphis Bank and Trust Co. v. Whitman,* 692 F.2d 427, 7 C.B.C.2d 727 (6th Cir.1982), in which the circuit authorized the prevailing unadjusted market rate of interest as the proper discount rate. The sixth circuit opinion is not binding on this Court, and in addition, the circuit made its ruling in two short, citationless paragraphs.

Although some courts have cited the legislative history of the Code claiming it approves the contract rate of interest as the presumed discount rate, see, e.g., *In Re Rogers,* 6 B.R. 472, 6 B.C.D. 1214, 3 C.B.C.2d 12 (Bkrtcy.S.D.Iowa, 1980),

> [t]he legislative history, ... makes no such suggestion in connection with the

proper discount rate under § 1325(a)(5)(B)(ii). The discussion of the legislative history cited by the *Rogers* court concerned the operation of § 502(b) in accelerating the principal amount of a claim.

Comment, Cramdown, 1981 Wisc.L.Rev. at 351, n. 107.

As discussed in part III of this opinion, this Court does not believe a discount rate based on an unadjusted contract rate of interest is a proper chapter 13 discount rate.

## V. § 6621 Interest

The Court next turns to the IRS statutory rate of interest contained in § 6621.

In May, 1982, § 6621 provided:

The secretary shall establish an adjusted rate of interest for the purpose of subsection (a) not later than October 15 of any year if the adjusted prime rate charged by banks during September of that year, rounded to the nearest full percent, is at least a full percentage point more or less than the interest rate which is then in effect. Any such adjusted rate of interest shall be equal to the adjusted prime rate charged by banks, rounded to the nearest full percent, and shall become effective on January 1 of the immediately succeeding year.

26 U.S.C. § 6621(b). This was amended effective January 1, 1983 to provide:

(1) ... If the adjusted prime rate charged by banks (rounded to the nearest full percent)—

(A) during the 6-month period ending on September 30 of any calendar year, or

(B) during the 6-month period ending on March 31 of any calendar year, differs from the interest rate in effect under this section on either such date, respectively, then the Secretary shall establish, within 15 days after the close of the applicable 6-month period, an adjusted rate of interest equal to such adjusted prime rate.

26 U.S.C. § 6621(b) as amended. The adjustment under amended § 6621(b)(1)(A) will be effective on January 1 of the succeeding year, and the adjustment under

amended § 6621(b)(1)(B) will be effective on July 1 of the same year. In each case, "prime" is the average predominant rate determined by the Federal Reserve Board.

Section 6621 has undergone several changes in recent years. On February 1, 1980 a 12% rate was established. This rate was set every two years and was equal to 90% of the prime rate charged by commercial lenders. During all of 1981, the § 6621 rate was 12%.

On February 1, 1982 the rate increased to 20%. Pursuant to the Economic Recovery Tax Act of 1981, P.L. 97–34, § 6621 was amended to provide for yearly adjustments based on 100% of the prime rate charged in the preceding September. Thus, the 20% rate effective February 1, 1982 was based on the average predominant rate in September, 1981. The February rate was effective until December 31, 1982.

Effective January 1, 1983 another change in § 6621 was made. The rate is now redetermined twice a year based on 100% of the average adjusted prime rate charged by commercial lenders during a six-month period ending September 30 and March 31. The rate for the period January 1, 1983 to June 30, 1983 is 16%.

According to the Federal Reserve System's monthly bulletin, the average prime rate from June, 1981 to January 31, 1982 ranged from 15.75% to 20.50%. All this time, the § 6621 rate was 12%. The average prime rate from February 1, 1982 to December 31, 1982 ranged from 11.50% in December, 1982 to 16.56%. All this time, the § 6621 was 20%, based on the 20.80% rate that existed in September, 1981.

The average prime is currently around 10.5%. The § 6621 rate is now 16% and will remain at this rate until June 30, 1982.

In May, 1982 when the Fishers' plan was confirmed, average prime rate was 16.5%. The § 6621 rate was 20%. In November, 1981 when the Fishers filed their plan, the prime rate was 16.84%, while the § 6621 rate was 12%. In Lorence, the prime rate on the petition date (February 3, 1983) was about 10% while the § 6621 rate was 16%.

The Court has derived this discussion of § 6621 from the following Tax Services: 8 Standard Federal Tax Reporter (CCH) ¶ 5519H to 5519K (1983), 25 Federal Tax Coordinator 2d (RIA) ¶ 4–1001 to 4–1004 (1983). Prime rates are derived from figures released by the Federal Reserve Board in the monthly Federal Reserve System Bulletin. A table of the Federal Reserve's average prime rate. is attached to this opinion in the appendix, and is derived from the January, 1983 Federal Reserve System Bulletin, pg. A27.

In 1982 section 6621 provided for an adjusted interest rate based on 100% of the average prime rate quoted by commercial banks to large businesses, as determined by the Federal Reserve System's Board of Governors. "Prime" is the "first rate charged by commercial banks to prime commercial loan customers." D. Thorndike, Thorndike's Encyclopedia of Banking and Financial Tables XXIX (rev. ed. 1980). The determination of "prime" is influenced by the general level of money rates, the availability of excess reserves, general business conditions, size and term of the loan, and geographic variations (rates in money centers such as New York City or Los Angeles tend to be lowest). See G. Munn & F. Garcia, Encyclopedia of Banks and Finance 749 (7th Ed.1973). As reported in Cox, Bankers Desk Reference (Supp.1982), the meaning of "prime" has recently been questioned:

> A Greenwich Research Study showed that nearly 70 percent of large corporations are offered below-prime loans. The staff of the Committee on Banking, Finance and Urban Affairs of the House of Representatives released a report in April concluding that 'the once clear barometer of interest rates has become a murky, ill-defined term that rarely reflects the lowest rates available to corporate customers.'

Cox, supra at 16.

Thus, prime is really also a form of contract rate established for low-risk customers. Elements of profit and administration costs are necessarily still included. The first court to adopt a discount rate equal to the § 6621 rate of interest was *In Re Ziegler*, 6 B.R. 3, 6 B.C.D. 194 (Bkrtcy.S.D.Ohio 1980). At the time, § 6621 provided for a modest 12% rate of interest. *Ziegler* was followed by *In Re Busman*, 5 B.R. 332, 6 B.C.D. 683 (Bkrtcy.E.D.N.Y.1980). The rate was 12% once again. The following additional cases have either held that present value of all secured claims or just an IRS secured claim will be computed based on a § 6621 discount rate. *In Re Caudle*, 13 B.R. 29, 7 B.C.D. 1301 (Bkrtcy.W.D.Tenn.1981) (12% rate); *In Re Strong*, 12 B.R. 221 (Bkrtcy.W.D.Tenn.1981) (12% rate); *In Re Crotty*, 11 B.R. 507, 7 B.C.D. 976 (Bkrtcy.N.D.Tex.1981) (IRS receives 12% rate); *In Re Johnson*, 8 B.R. 503 (Bkrtcy.S.D.Tex.1981). It is significant to note that this Court was unable to find a single published decision allowing creditors in general or the IRS in particular as a chapter 13 discount rate the 20% rate that existed under § 6621 last year or the current 16% rate that will exist until June 30, 1983. The Court could find only two published cases addressing discount rates under § 6621 after the rate rose to 20%.

In *In Re Stafford*, 24 B.R. 840 (Bkrtcy.D.Kan.1982) (Franklin, J.), the Court stated that while,

> 26 U.S.C. § 6621 is generally reflective of the economy, an annual adjustment may not be sufficient.

Id. at 842. The Court was concerned that at the time of confirmation, the § 6621 rate was 20% (it had been 12% when the debtor's petition was filed), but "the actual prime rate is currently considerably less than 20%; and was less than 20% at the time of confirmation." Id. at 842. Judge Franklin "reserve[d] the right to use the 26 U.S.C. § 6621 rate in effect at the time of the petition rather than at the time of confirmation." Id. Judge Franklin reserved the right to refuse to use the current § 6621 rate whenever the current rate was not "reflective of the current prime rate. . . ." Id. Thus, the IRS did not receive the § 6621 rate, but rather received a rate Judge Franklin felt was closer to the prevailing rate at confirmation time.

In *In Re Tacoma Recycling, Inc.,* 23 B.R. 547 (Bkrtcy.W.D.Wash.1982), the Court rejected the § 6621 rate as a discount rate in chapter 11, because it was not responsive to current economic conditions. The previous § 6621 rate,

> arbitrarily set a mark of 20% interest, based on the highest prime rate of the 18 · month period. This created an artificial rate, which was static during a period when there was significant fluctuation in the average prime rate.

23 B.R. at 550. Rather *Tacoma,* adopted the rate set according to 28 U.S.C. § 1961(a), section 302(a) of the Federal Courts Improvement Act of 1982 for interest on Federal Court judgments. This rate is equal to the coupon yield equivalent rate of the sale of 52 week T-Bills auctioned 13 times per year. This rate was established after careful consideration of § 6621:

> Initially, language in the various bills would have adopted for all cases the rate set for tax cases under 26 U.S.C. § 6621. This rate is currently 20% due to the very high interest rates in 1981 and will not be readjusted until February, 1983. The Office of Management and Budget pointed out the high costs to the United States that this rate would cause and noted that *it does not change sufficiently often to reflect market conditions.* Memorandum to all United States Judges [re:] Post Judgment Interest,' June 22, 1982, p. 1 (emphasis added).

*In Re Tacoma Recycling, Inc.,* 23 B.R. at 550. For instance, effective February 1, 1982 the rate of interest pursuant to 26 U.S.C. § 6621 was 20% per annum. This rate was effective through December 31, 1982, and was set based on the adjusted prime rate prevailing in the month of September, 1981. If the rate in 26 U.S.C. § 6621 were to apply and in the discount rate was set as of the date of confirmation, a chapter 13 case confirmed in November or December, 1982 would be based on prevailing prime rate in September, 1981, 15 months previous. The discount rate in the Fisher case would be 20% at a time when prime was actually only 11.50%.

Thus, since the § 6621 rate has ballooned, two courts, and the Office of Management and Budget, have determined that § 6621 is not an accurate reflection of present value.

■ This Court wholeheartedly agrees. Even though the § 6621 is now computed twice a year, it is still based on a prime rate existing from 3 to 8 months before the § 6621 rate went into effect, and up to 14 months before the period in which the § 6621 remains effective. Thus, it is still an inadequate economic reflection of present value in these volatile times. Furthermore, since it is based on prime, a contract rate, albeit a low risk nonbankruptcy debtor contract rate, many of the objections to an unadjusted contract rate voiced in part III of this opinion are applicable. Therefore, the Court holds that § 6621 does not provide an accurate discount rate in chapter 13 cases for the IRS secured claims or any other creditor's secured claim.

## VI. T-Bill Rate of In Re Jewell

On August 17, 1982 this Court prospectively ruled the discount rate would be based on the equivalent coupon yield rate of 52 week treasury bills auctioned every four weeks. *In Re Jewell,* 25 B.R. 44 (Bkrtcy.D. Kan.1982). The use of the prevailing treasury bill discount rate has been advocated by other courts. See, *In Re Willis,* 6 B.R. 555, 6 B.C.D. 1101 (Bkrtcy.N.D.Ill.1980); *In Re Campbell,* 16 B.R. 496 (Bkrtcy.N.D.Ill. 1982); *In Re Tacoma Recycling, Inc.,* 23 B.R. 547 (Bkrtcy.W.D.Wash.1982).

In reaching its ruling in *In Re Jewell,* this Court was most influenced by the analysis of *In Re Willis,* 6 B.R. 555, 6 B.C.D. 1101 (Bkrtcy.N.D.Ill.1980). In arriving at a discount rate, this Court could have started with a contract rate and broke it down excising and adjusting those components of the contract rate it believed were inappropriate, inapplicable, or altered in chapter 13. Alternatively, as was the Court's choice, a risk-free rate of interest could be established, and risk components could be added on. The result should be and is the same. Under either method, the Court believes the resulting risk free rate applicable to this

case is the coupon equivalent yield rate, computed every four weeks based on the sale of 52 week T-Bills. The IRS does not make 25% on loans to consumers, nor does it approach Bell Telephone or General Motors Corporation and lend them money at the "prime" rate of interest, the rate charged by a lender to its "best" customers. The government sells bills. The IRS is part of that government. Thus in the case of the IRS, the T-Bill rate is accurately reflective of a proper discount rate.

■ Therefore, as to the IRS, the only creditor objecting in these cases, this Court believes its decision in *In Re Jewell* and the decision in *In Re Willis* are the correct methods for determining a chapter 13 discount rate. Regardless of IRS opinion as to the applicability of *Jewell* to all creditors, the IRS is not a class representative and lacks standing to object herein for anyone other than itself.

## VII. *Prospectivity of Jewell* (as applied in *In Re Fisher*)

This Court established a 10% discount rate in all cases when the Code became effective. This followed the holding of the first case to address the issue: *In Re Lum,* 1 B.R. 186, 5 B.C.D. 1039 (Bkrtcy.E.D.Tenn. 1979). At the time 10% was also the maximum interest rate allowed in Kansas for non-licensed lenders. After *Lum,* other cases approved a 10% discount rate. See, e.g., *In Re McLeod,* 5 B.R. 520, 2 C.B.C.2d 319 (Bkrtcy.N.D.Ga.1980); *In Re Weaver,* 5 B.R. 522, 2 C.B.C.2d 315 (Bkrtcy.N.D.Ga. 1980).

The 10% rate stood unchallenged in this Court until 1982 when several creditors petitioned the Court to apply a discount rate other than 10%. The T-Bill rate was one of the rates suggested. The IRS was not among the petitioning creditors. On August 17, 1982 the Court prospectively ruled that the discount rate would be based on the equivalent coupon yield rate of 52 week treasury bills auctioned once every four weeks.

In *Jewell* and as later explained in *In Re Redeker,* 27 B.R. 734 (Bkrtcy.D.Kan.1983),

the Court held the new T-Bill discount rate applied

> ... only to the objecting creditors in the instant bankruptcy cases, and to creditors of debtors filing petitions on or after September 2, 1982.

25 B.R. at 46. The Court intended that those creditors who had objected to the 10% rate, claiming it was an improper rate, prior to the date the *Jewell* decision was rendered, would be governed by the *Jewell* decision and would receive a *Jewell*-based discount rate. All other secured creditors in cases filed before September 2, 1982 would receive the standard 10% rate.

■ The reasons for making *Jewell* prospective are obvious. There are thousands of chapter 13 cases before this Court. Some are confirmed, and some are coming up for confirmation. To allow a change in the 10% discount rate in confirmed cases would force the dismissal of many of those cases. In addition, the determination of the monthly T-Bill rates for 1979, 1980, 1981 and the first 7 months of 1982 would be very time consuming for the trustee, especially if the trustee would have to then sift through every active file to determine if the debtor's plan would still be feasible with the T-Bill discount rate under 11 U.S.C. § 1325(a)(6).

There are also statutory grounds for making the *Jewell* decision prospective only. 11 U.S.C. § 1327(a) explicitly provides:

> The provisions of a confirmed plan *bind* the debtor and *each creditor,* whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan.

(emphasis added). Confirmation of the plan is res judicata. See *In Re Norton,* 15 B.R. 623, 625, 8 B.C.D. 647, 5 C.B.C.2d 876 (Bkrtcy.E.D.Pa.1981); *In Re Willey,* 24 B.R. 369, 9 B.C.D. 1002 (Bkrtcy.E.D.Mich.1982); 5 Collier on Bankruptcy ¶ 1327.01[1] at 1327–2 (15th Ed.1982)). "The Order of Confirmation is ... res adjudicata as to all justiciable issues decided or which could

have been decided at the hearing on confirmation." *In Re Lewis,* 8 B.R. 132, 137, 7 B.C.D. 105 (Bkrtcy.D.Idaho, 1981). In the instant case, the plan was confirmed on May 10, 1982 without objection by the IRS, under the Court's prevailing 10% discount rate. On January 27, 1983, the IRS objected to the 10% discount rate. The IRS however, was bound by the confirmation of the plan in May, under § 1327(a). The plan was confirmed in court allowing the prevailing 10% discount rate, and statutorily, the IRS cannot now attack that rate. The issue of the IRS' discount rate is res judicata.

Finally, even if the 10% discount rate was improper in May, 1982, there has been no showing by the IRS other than its § 6621 argument as to what it believes was the proper rate considering the prevailing market conditions. The question of a proper discount rate is factual, just as a proper capitalization rate is factual in reorganization valuations. See, e.g., Gardner, The SEC and Valuation Under Chapter X, 91 U.Penn.L.Rev. 440 (1932); Coogan, Confirmation of a Plan Under the Bankruptcy Code, 32 Case W.Res.L.Rev. 301, 313–14 (1982). Without a showing that the 10% rate was improper or unreflective of the May, 1982 economic times, the Court can only presume the 10% was reflective and proper.

In summary, both administratively and statutorily, the Court believes its decision to apply *Jewell* prospectively only was correct, equitable, and in the Fisher case unchallengeable by the IRS, because of 11 U.S.C. § 1327(a).

## VIII. A Risk Factor

The Court believes a 1% risk factor is an accurate reflection of the risk inherent in a chapter 13 proceeding in which a creditor takes the steps provided for under the Code to protect itself. The add on of a 1% risk factor has been approved by several courts. *In Re Willis, supra; In Re Campbell, supra; In Re Levine,* 10 B.R. 168, 170 n. 4 (Bkrtcy. D.Mass.1981).

## IX. Variable Rate During the Life of the Plan

The Court knows of no published opinion in which a court has approved a variable discount rate during the life of the plan, and for good reason. The trustee in this district computes and informs the Court if the debtors' proposed payments will pay out in the statutory time limit. See 11 U.S.C. § 1322(c). A number of plans run 60 months, the statutory good cause maximum. Furthermore, most times, the debtor is dedicating all of his discretionary available income to plan payments, and the debtor has little or no ability to increase his payments. If a 5 year plan was confirmable in 1983 at a 12% discount rate, leaving the debtor virtually no discretionary income after plan payments, but the discount rate rose to 15% in 1984, the debtor would be required to modify his plan to make additional payments in order to pay out in 5 years. The debtor, however, could not make such additional payments and the plan would have to be dismissed. In 1983 at the confirmation hearing, knowing interest rates could probably rise and knowing the debtor did not have the ability to make payments under a plan where the discount rate was 15%, the Court could not find that "the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1325(a)(6). The trustee could not determine whether confirmation mathematically should be recommended. Chapter 13 confirmations simply could not be made.

The administrative infeasibility of a variable interest rate is certainly obvious in the IRS' own unwillingness to set its § 6621 interest rate more than twice a year, even after the Office of Management and Budget labelled it unreflective of current market conditions.

Furthermore, § 1325(a)(5)(B)(ii) provides the value to be received should be judged "as of the effective date of the plan", not the value at various points during the plan. The question in determining the present value of a stream of payments is what is the value *today* of payments to be received

periodically over a period of time. See M. Sherman, Comprehensive Compound Interest Tables 118–19 (1982); D. Thorndike, Thorndike's Encyclopedia of Banking and Financial Tables 8–4 (rev. ed. 1980). The value *today* presumes a rate of interest *today.*

Thus, in addition to being administratively infeasible, and unsupported in published case law, a variable discount rate is also contrary to the concept of present value contained in 11 U.S.C. § 1325(a)(5)(B). The only Court addressing the issue of variable discount rates has rejected the idea. See *In Re Stafford,* 24 B.R. 840 (Bkrtcy.D.Kan. 1982) (Franklin, J.). For the above reasons, this Court likewise rejects variable discount rates.

## X. Different Rate for Different Creditors vs. a Rate for all Creditors.

The Court does not believe the IRS has standing to argue the propriety of the Court's decision to grant all undersecured creditors the same discount rate in a given chapter 13 case. The IRS does not represent all undersecured creditors. The IRS has standing only to argue that the rate it receives is improper. Any arguments by the IRS on this point must be rejected for lack of standing.

Because of the import of such an argument, however, the Court will endeavor to address the hypothetical issue.

This Court is not the only Court granting the same discount rate to secured creditors. The holding of the following Courts appear to indicate application of a uniform rate regardless of how that rate is determined: *In Re Willis,* 6 B.R. 555, 6 B.C.D. 1101 (Bkrtcy.N.D.Ill.1980); *In Re Lum,* 1 B.R. 186, 5 B.C.D. 1039 (Bkrtcy.E.D.Tenn.1979); *In Re McLeod,* 5 B.R. 520, 2 C.B.C.2d 319 (Bkrtcy.N.D.Ga.1980); *In Re Weaver,* 5 B.R. 522, 2 C.B.C.2d 315 (Bkrtcy.N.D.Ga. 1980); *In Re Campbell,* 16 B.R. 496 (Bkrtcy. N.D.Ill.1981); *In Re Ziegler,* 6 B.R. 3, 6 B.C.D. 194 (Bkrtcy.S.D.Ohio, 1980); *In Re Caudle,* 13 B.R. 29, 7 B.C.D. 1301 (Bkrtcy.W. D.Tenn.1981); *In Re Strong,* 12 B.R. 221 (Bkrtcy.W.D.Tenn.1981); *In Re Johnson,* 8

B.R. 503 (Bkrtcy.S.D.Tex.1981). Furthermore, the Court has been convinced by the trustee of the administrative difficulties in granting a myriad of discount rates to various undersecured creditors in a given chapter 13 case. Any creditor could purchase a treasury bill if it was paid today. Therefore, the Court sees nothing incorrect in its use of T-Bill rates for all undersecured creditors in a given chapter 13 case. As the Court indicated previously, however, the IRS does not have standing to raise this argument.

Finally, based on the Court's analysis of risk-free interest rates, the Court believes the interest rate of all creditors begin with the same universally accepted risk-free rate, plus an add-on risk factor which in chapter 13 is essentially the same for all creditors, given the unique type of "loan" being "made" to a chapter 13 debtor. See Part III of this opinion, supra.

## XI. Summary—In Re Fisher

The issue of the proper discount rate to be granted the IRS in this case is res judicata, and the IRS is bound by the 10% discount rate prevailing at confirmation. Even if the issue is not res judicata, the Court believes its decision in *In Re Jewell,* supra, was correct and will adhere to it. Under *Jewell* the IRS would receive a discount rate of 10%.

## XII. Summary—In Re Lorence

The Court believes its decision to grant a discount rate equal to the equivalent coupon rate derived from the sale of 52 week treasury bills sold every 4 weeks in cases filed after September 2, 1982 is correct, and rejects either the unadjusted contract rate or the § 6621 rate as a proper and accurate measure of the chapter 13 discount rate. The Court believes an accurate risk factor in chapter 13 is a 1% add-on to the T-Bill rate and will require such a discount rate in all pending unconfirmed chapter 13 cases in which the T-Bill rate is applicable, and all future cases.

For the foregoing reasons, the IRS' objections are overruled.

IT IS SO ORDERED.

## APPENDIX

**AVERAGE PRIME RATE CHARGED BY BANKS** on Short-Term Business Loans

| MONTH | | AVERAGE RATE |
|---|---|---|
| 1981 | June | 20.03 |
| | July | 20.39 |
| | August | 20.50 |
| | September | 20.08 |
| | October | 18.45 |
| | November | 16.84 |
| | December | 15.75 |
| | | |
| 1982 | January | 15.75 |
| | February | 16.56 |
| | March | 16.50 |
| | April | 16.50 |
| | May | 16.50 |
| | June | 16.50 |
| | July | 16.26 |
| | August | 14.39 |
| | September | 13.50 |
| | October | 12.52 |
| | November | 11.85 |
| | December | 11.50 |

Source: Federal Reserve Bulletin