## In re Elroy & Patricia CLARK, Debtors.

### Bankruptcy No. 93–22408.

United States Bankruptcy Court,
W.D. New York.

June 2, 1994.

---

Peter Scribner, Rochester, NY, for debtors.

Michael J. Looby, Rochester, NY, for City of Rochester.

George M. Reiber, Chapter 13 Trustee, Rochester, NY.

## DECISION & ORDER

JOHN C. NINFO, II, Bankruptcy Judge.

### BACKGROUND

On November 2, 1993, the debtors, Elroy Clark and Patricia Clark (the "Debtors"), filed a petition initiating a Chapter 13 case. On their schedules, the Debtors listed the City of Rochester and the County of Monroe as secured creditors for unpaid property taxes due for their residence at 125 Elmdorf Avenue ("Elmdorf Avenue").

On November 16, 1993, the Debtors filed a Chapter 13 Plan (the "Plan"). The Plan provided that the holders of allowed secured claims would retain the liens securing their claims and that the "City of Rochester taxes ($7,642.00), Monroe County taxes ($5,593.00), and all other valid secured claims, if any, shall be paid in full by the trustee to the extent they are secured by the fair market value of the security." The Plan also provided that after the payment of secured claims, unsecured creditors would receive a 100% dividend on their claims if timely filed and allowed.[1]

Prior to the hearing on confirmation of the Plan scheduled for December 20, 1993, the City of Rochester filed several secured proofs of claim. One secured claim for the 1990/1991 tax year was in the amount of $1,516.83, representing principal of $1,406.74, interest to the date of the petition in the amount of $524.01 and post-petition interest (pursuant to Section 506(b)) to the date of the Proof of Claim in the amount of $14.67, less payments of $428.59. The remaining City of Rochester secured proofs of claim were for the 1991/1992 tax year in the amount of $2,109.18, the 1992/1993 tax year in the amount of $2,182.81, the 1993/1994 tax year in the amount of $1,999.68 and for unpaid water charges in the amount of $315.62. (These City of Rochester secured proofs of claim are hereinafter collectively referred to as the "City Tax Claim").[2]

In Chapter 13 cases prior to September, 1993, the City of Rochester had either filed secured proofs of claim requesting post-confirmation interest at a rate of 9% per annum or had not objected to the confirmation of Chapter 13 plans which provided for the payment of post-confirmation interest on its allowed secured claim at a rate of 9% per annum.[3] The City Tax Claim, however, included the statement that "[t]he interest rate for City real property taxes is fixed by local law at 1½% per month (18% APR) from the month due until paid, Rochester City Charter § 6–111. The City claims interest on property tax claims at 18% per year, as provided by law." In view of this change in position by the City of Rochester, the confirmation hearing was adjourned to afford the Debtors the opportunity to make a formal written objection to the City Tax Claim in connection with the confirmation of their Plan.

On January 11, 1994, the Debtors filed an objection to the City Tax Claim (the "Claim Objection"). The Claim Objection did not object to the amounts set forth in the Claim

---

1. The best interests of creditors analysis presented by the Chapter 13 Trustee at the confirmation hearing showed that in a liquidation, the unsecured creditors would receive no distribution.

2. On November 30, 1993, the County of Monroe filed a secured Proof of Claim for unpaid real estate taxes due for Elmdorf Avenue in the amount of $4,659.09. The County's proof of claim requested interest on that amount until

paid in full at the rate of 9% per annum, a rate less than its statutory default rate of 18% per annum.

3. Notwithstanding its prior position in Chapter 13 cases, the City of Rochester has consistently taken the position in Chapter 11 cases that the post-confirmation interest rate to be paid on its secured claims is the statutory default rate of 18% per annum.

or that pre-confirmation interest at the statutory default rate of 18% per annum accrued and was payable on the principal amount of the fully secured Claim pursuant to Section 506(b). The Claim Objection did, however, assert that pursuant to Section 1325(a)(5)(B)(ii) the Court should set a post-confirmation interest rate to be paid on the allowed amount of the fully secured City Tax Claim equivalent to the City's cost in borrowing funds, but in no event in excess of 9% per annum.[4] The City of Rochester filed opposition to the Claim Objection asserting that the statutory default interest rate of 18% per annum was the proper rate for the Court to use pursuant to Section 1325(a)(5)(B)(ii).

On January 19, 1994, the Court heard oral argument by the attorneys for the parties and the Chapter 13 Trustee (the "Trustee"), and on February 11, 1994, it conducted an informal conference with the attorneys and the Trustee to discuss the matter in more detail to determine whether it could be settled. Thereafter, when it was determined that the parties could not agree on a post-confirmation interest rate to be paid on the City Tax Claim, the Court reserved on the matter and afforded the parties the opportunity to make additional written submissions.

## DISCUSSION

In order for a Chapter 13 plan to meet the requirements of Section 1325(a)(5)(B)(ii) [5], the plan must propose to pay an allowed secured claim by the payment of deferred principal payments aggregating the face amount of the allowed claim, plus interest at an appropriate discount rate over the payment term. Neither the U.S. Supreme Court [6] nor the Second Circuit Court of Appeals has established an appropriate present value factor to meet the requirements of Section 1325(a)(5)(B)(ii). Other courts have varied widely in their selection of an appropriate present value factor. Courts have selected a contract rate [7], treasury bill rate [8], federal judgment rate [9], state judgment rate [10], prime rate (in some cases adjusted by a risk factor) [11], cost of funds rate [12], and

**4.** The Debtors in asserting that a "cost of funds" rate was the appropriate present value rate relied heavily on the analysis in 5 *Collier on Bankruptcy* ¶ 1325.06[4][b][iii][B] (15th ed. 1994). The Editors of *Collier on Bankruptcy* believe that such a rate best achieves the purpose of § 1325(a)(5)(B)(ii) which is to put the creditors in the same position economically as if the Debtor surrendered the collateral. *Id.* at 1325–47.

This Court has previously used a cost of funds analysis in setting an interest rate to be paid by a debtor which was authorized by the Court to make payments over time to cure its defaults due to a multinational corporation under an executory contract assumed pursuant to Section 365. *In re Riva*, No. 90–21609, slip op. at 4 (Bankr. W.D.N.Y. Sept. 24, 1992).

**5.** Section 1325(a)(5)(B) provides:

Except as provided in subsection (b), the court shall confirm a plan if—
(5) with respect to each allowed secured claim provided for by the plan—
(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

**6.** The U.S. Supreme Court, in its recent decision in *Rake v. Wade*, — U.S. —, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993), did not establish a dis-

count rate. The Court did, however, state that the purpose of payment of interest on such an allowed secured claim was to "compensate the creditor for the decreased value of the claim caused by delayed payments." *Wade*, — U.S. at —, 113 S.Ct. at 2192 n. 8, 124 L.Ed.2d at 433 n. 8.

**7.** *In re Smith*, 4 B.R. 12, 13 (Bankr.E.D.N.Y. 1980). Although an amendment requiring this was rejected by Congress. *See* 5 *Collier on Bankruptcy* ¶ 1325.06[4][b][iii][B] at 1325–47 (15th ed. 1994).

**8.** *In re Fisher*, 29 B.R. 542, 552 (Bankr.Kan. 1983).

**9.** *In re Tacoma Recycling*, 23 B.R. 547, 550 (Bankr.W.D.Wash.1982).

**10.** *In re Spader*, 66 B.R. 618, 624 (W.D.Mo.1986); *In re Johnston*, 44 B.R. 667, 670 (Bankr.W.D.Mo. 1984).

**11.** *Matter of Jordan*, 130 B.R. 185, 192 (Bankr. D.N.J.1991).

**12.** *In the Matter of Campbell*, 16 B.R. 496, 497 (Bankr.N.D.Ill.1982); *In re Hardzog*, 74 B.R. 701, 703 (Bankr.W.D.Okl.1987), *aff'd*, 113 B.R. 718 (W.D.Okla.1989) (rate pursuant to a similar section, § 1225(a)(5)(B)(ii), in a Chapter 12).

coerced loan rate.[13]

In its recent decision in *In re Callahan,* 158 B.R. 898, 903 (Bankr.W.D.N.Y.1993), *aff'd sub nom. In re Williams,* No. 93–CV–6492 (W.D.N.Y. May 27, 1994), this Court held that to satisfy the cure requirements of Section 1322(b)(5) and the present value requirements of Section 1325(a)(5)(B)(ii) fully secured home mortgage arrearages, in the absence of a different agreement among the parties, must be paid over the term of a confirmed Chapter 13 plan together with a present value factor equal to the New York State judgment interest rate. In its decision, which focused primarily on the curing of home mortgage arrears pursuant to Section 1322(b)(5), the Court discussed in some detail the successful twenty-year history of the Chapter 13 program in the Western District of New York. *Callahan,* 158 B.R. at 902–903. The Court emphasized the need to promote an effective Chapter 13 program which accomplishes all of the goals of Chapter 13, including allowing debtors to propose and have confirmed plans which will allow them to save their homes and to have those plans confirmed in a cost-effective manner. *Id.* In *Callahan,* the Court discussed the prior acceptance by the courts, secured creditors and debtors in the Western District of New York of the New York State judgment rate as an appropriate present value factor under Section 1325(a)(5)(B)(ii) for home mortgage arrearages as well as a welcomed administratively convenient rate which assisted the Chapter 13 program in meeting its various goals. *Id.*

Because most mortgages contain real estate tax escrow provisions, there are not as many Chapter 13 debtors who have unpaid real estate taxes due when they file their Chapter 13 plans as there are debtors who have mortgage arrearages. However, Chapter 13 debtors frequently do have significant unpaid real estate taxes due on their residences, and in many cases, the need to pay these unpaid real estate taxes over time in

order to save their homes is one of the primary purposes of the Chapter 13 filing.

It appears from the submissions of the City of Rochester that: (1) the 18% per annum default rate was enacted in 1981 when loan and certificate of deposit interest rates were high, in part to deter commercial and ordinary taxpayers from paying real estate taxes only on the eve of tax foreclosure while otherwise more favorably investing the funds or paying a lower rate of interest to the City than to their other creditors or lenders, and also to make its default rate uniform with the County of Monroe; (2) although the City does not borrow for operations, its present cost of borrowing, exclusive of related fees and costs, is approximately 4.7% per annum; (3) real estate taxes constitute a substantial portion of the operating budget of the City and its school district; (4) the annual tax levy anticipates a default factor to insure that there will be sufficient funds collected to guaranty the delivery of necessary municipal services; (5) the City would prefer that the Court set a fixed rate rather than a floating rate under Section 1325(a)(5)(B)(ii); and (6) the City believes that the statutory default rate is the appropriate rate for the Court to select in order to achieve uniformity of local real estate taxation, administrative convenience, fairness and equity to all City taxpayers and would put the City in the same position as if the Debtor surrendered its residence to the City, since the City contends as the first lien creditor it always receives its 18% per annum default rate either by redemption or in tax foreclosure proceedings; and (7) there are only between 300–400 delinquent taxpayers involved annually in Chapter 13 cases.[14]

In his submission the Trustee contended that: (1) the City raised its default rate from 9% to 18% per annum in part to penalize defaulting taxpayers; (2) if the New York State judgment rate, itself intended to provide a judgment creditor with the continuing value of its judgment over time, was set as the appropriate present value rate under

**13.** *See In re Fisher,* 29 B.R. 542, 544 (Bankr.D.Kansas 1983).

**14.** A number of these cases will be dismissed or converted before a confirmed plan is completed.

In these cases, it appears that the City will ultimately receive payment on any delinquent taxes together with interest at the statutory 18% default rate.

Section 1325(a)(5)(B)(ii) it would provide an administratively convenient rate and one which, as in *Callahan,* would allow debtors to save their homes and have their plans confirmed in a cost-effective manner; and (3) the City had presented no compelling circumstances which would warrant the Court selecting a different present value factor for the repayment of delinquent real estate taxes than the Court set in *Callahan* for the repayment of fully secured home mortgage arrears.

In its submissions, the Debtors asserted that: (1) when the Court must set the post-confirmation interest rate under Section 1325(a)(5)(B)(ii), it should use the same rate for all secured creditors, which in this Court should be the New York State judgment rate selected by the Court in *Callahan;* [15] and (2) a cost of funds analysis would justify the Court in setting a post-confirmation interest rate of even less than 9% per annum for the City Tax Claim.

The Court believes that the New York State judgment interest rate is an appropriate post-confirmation interest rate under Section 1325(a)(5)(B)(ii) to be paid to the City of Rochester for unpaid taxes on a Chapter 13 debtor's residence.[16] The Court believes that it is an appropriate present value factor to be paid on the City Tax Claim because: (1) it is a rate which New York State and this Court believe adequately compensates a creditor for the decrease in value of a claim caused by delayed payment; [17] (2) in view of the Court's holding in *Callahan* and the position of the County of Monroe in Chapter 13 cases, it will provide an administratively convenient rate for the payment of post-confirmation interest on claims against homeowners in Monroe County with pre-petition defaults on their home mortgages and real estate taxes; (3) it will assist such homeowners in saving their homes and · having their plans confirmed in a cost-effective manner; (4) it fairly compensates the City of Rochester for delayed payments in view of the City's borrowing rate, even when adding a factor for fees and costs which would be incurred in borrowing as well as recognizing the administrative costs incurred by the City in the Chapter 13 cases; (5) it takes into consideration the fact that the City Tax Claim already includes some default interest at 18% per annum so that there is a substantial interest on interest component being paid to the City; (6) by helping homeowners retain their homes, it will help stabilize City neighborhoods which will be of benefit to the City and all City taxpayers; and (7) it will not have a significant negative impact on the City's ability to provide necessary services because the repayment of delinquent taxes in this manner will take place over the relatively short term of most Chapter 13 plans; and (8) balancing all of the equities, it would not be inequitable to the City or its taxpayers to be treated this way as compared to the furtherance of the policies and purposes of Chapter 13.

## CONCLUSION

To satisfy the requirement of Section 1325(a)(5)(B)(ii), the City Tax Claim shall be paid together with post-confirmation interest equivalent to the New York State judgment rate until paid in full.

**IT IS SO ORDERED.**

---

**15.** This position seems inconsistent with the Debtor's assertion that the appropriate rate is a "cost of funds" rate which focuses on the individual circumstances of the secured creditor.

**16.** The United States District Court for the Western District of New York asserted that federal courts have broad discretion in determining the appropriate rate of interest where there is no controlling federal statute. *In re Williams,* No.

93–CV–6492, slip op. at 17 (W.D.N.Y. May 27, 1994). The Court continued by stating, "[i]n similar circumstances, courts have recognized the broad discretion afforded to federal courts in selecting the appropriate rate of interest." *Id.*

**17.** *See* Legislature of New York, 204th Sess., 1981 N.Y.Laws Ch. 258, Memo. of Office of Court Admin., at 2724 (McKinney 1981).