**In re ASSOCIATED WOOD PRODUCTS, INC.,**
**Debtor.**

**No. 04–36650.**

United States Bankruptcy Court,
D. Minnesota.

April 20, 2005.

Raphael T. Wallander, Nauni J. Manty, Minneapolis, MN, for Associated Bank Minnesota, N.A.

Kurt M. Anderson, Minneapolis, MN, for the Debtor.

Micahel Fadlovich, Minneapolis, MN, for the U.S. Trustee.

## ORDER DENYING CONFIRMATION

DENNIS D. O'BRIEN, Bankruptcy Judge.

This matter was heard on April 7, 2005, on confirmation of the debtor's proposed Chapter 11 plan of reorganization. Appearances were as noted in the record of the hearing. Having heard testimony and considered documentary evidence submitted, and having considered oral argument and reviewed briefs, now being fully advised in the matter, the Court makes this **ORDER** pursuant to the Federal and Local Rules of Bankruptcy Procedure.

### I

Confirmation is denied. The proposed plan does not comply with the legal requirements of the Code in that the plan proposes payment of variable interest rates on allowed secured claims. Feasibility has not been shown, in that the plan is based on projections that have not been substantially realized during pendency of the case, and future projections appear speculative. The plan is not fair and equitable to the dissenting classes because the plan would unreasonably delay them the right to pursue guaranties against third parties.

### II

The debtor, Associated Wood Products, Inc. (AWP), was founded in 1977 by Gary Gruett, its' current president and CEO. Currently, one third of AWP's business is devoted to manufacturing specialty cabinets, millwork, and components for other manufacturers. One third of AWP's business is sold through lumber yards or other

distributors. Sales of specialty millwork and cabinetry to contractors, commercial and residential, make up the final third.

In 2001 and 2002, AWP closed its two shops in Bloomington and moved into a new facility in Rosemount, Minnesota. Due to delays with banking, construction and dust collection installation, the move cost over $500,000.00 more than the $200,000.00 budgeted for moving expenses. The move resulted in annual increased rent and associated facility costs of at least $300,000.00. During a 2002 recession, AWP lost two larger volume customers, and AWP did not meet its projected sales quotas, which contributed to losses in 2002. AWP suffered losses in 2003 and 2004, and has generally substantially underperformed its financial projections since the move.

AWP's landlord in its current facility is the Gruett–Labriola Limited Partnership, consisting of Gary Gruett (AWP's CEO), and the late John Labriola, Gruett's father-in-law. This partnership is an insider for purposes of the Bankruptcy Code. The partnership has been AWP's landlord in prior facilities as well. Pursuant to a seventeen year practice between the AWP, the partnership, and historical understandings with both parties' lenders (prior to the acquisition of Signal Bank by Associated Bank), rent is based on a pass-through of mortgage payments, real estate taxes, and operating costs.

In the latter part of 2002 AWP's bank, Signal Bank, was acquired by Associated Bank of Wisconsin. Associated Bank froze AWP's line of credit and asked that AWP restructure its debt with the other major creditors holding mortgages and equipment leases. In April 2003, AWP's annual line of credit came due and Associated Bank demanded immediate payment and accelerated two equipment loans. Although AWP was current with all principal and interest payments to Associated Bank, the Bank exercised its rights under its loan documents to declare AWP in default because the losses incurred in 2001 and 2002 had changed the "ratios" and "stock holders equity" to numbers not in compliance with the loan documents. Associated Bank's collateral ratio to debt position was and remains approximately 2.65 in assets to 1 in debt when valued at going concern and approximately 1.9 to 1 when valued at organized liquidation.

AWP tried to obtain alternate financing but discovered that the ratios and previous two years' losses prevented any kind of conventional banking relationship without an infusion of working capital. AWP proposed a solution that would involve an asset based lender and two investors (one a customer) that would pay down $650,000.00 of the $750,000.00 owed to Associated Bank in the summer of 2003. This proposal, in addition to paying the bank 87 percent of its loans, would also have provided $200,000.00 in wiggle room in a line of credit. The Bank was asked to select $200,000.00 in equipment collateral to secure the Bank's $100,000.00, three year note, and release the other $370,000.00 as security for the investors who would invest $400,000 in cash. But, the Bank would not convert any of the short-term debt to long-term debt and demanded that AWP pay the Bank in full by September 2003.

AWP was unable to obtain alternate financing during several extensions given AWP by the Bank, and filed for relief under Chapter 11 of the Code on November 14, 2004.

### III

AWP proposes a 100% payment plan that would pay interest at a variable rate to Associated Bank amortized over 7 years. The plan would prevent the Bank

from pursuing insider guarantors as long as AWP is not in default, and would result in the assumption of the lease with the insiders. The Bank objects to confirmation, arguing that AWP has not shown that the plan is feasible because the financial projections upon which it is based have no historical support and are speculative. The Bank argues that the plan is not fair and equitable to the Bank because it would impermissibly convert the Bank's debt into long-term debt. Finally, the Bank argues that the plan is not fair and equitable because it would unreasonably prevent the Bank from pursuing third party insider guarantors.[1]

## IV

*Violation Of The Bankruptcy Code*

■■■ The proposed plan would pay dissenting classes a variable rate of interest. Proposed payment of variable interest rates in plans has been determined by the Eighth Circuit Court of Appeals to violate the Code's required present value treatment of allowed secured claims.

We also reject the bankruptcy court's finding that a floating rate of interest would better accommodate fluctuations in interest rates in general, and would thus better provide the government with the present value of its claim. That section 1129(a)(9)(C) contemplates the use of a fixed interest rate is evident in its requirement that present value be determined "as of the effective date of the plan." 11 U.S.C. § 1129(a)(9)(C). Moreover, the use of a floating interest rate would be administratively difficult and would complicate a determination of the feasibility of the debtor's reorganization plan, a prerequisite for confirmation. *Cf. In re Fisher*, 29 B.R. 542, 551–52 (Bankr.D.Kan.1983) (rejecting floating rate in present value analysis under similar language in Chapter 13). We therefore hold that the bankruptcy court erred in finding that the government would receive the present value of its claim if paid interest on the deferred payments at the rate paid on thirteen week treasury bills at the time of each quarterly payment.

*United States v. Neal Pharmacal Company*, 789 F.2d 1283, 1286 (8th Cir.1986). A proposed plan is confirmable only if the court finds that it complies with the provisions of Title 11. See 11 U.S.C. §§ 1129(a)(1). This plan does not comply with 11 U.S.C. §§ 1129(b)(2)(A), and the plan is not confirmable.

*Feasibility*

■■■ AWP must have cash available in at least the amount of $353,000.00 each month to service the plan. AWP's actual monthly cash availability has varied substantially under that amount over the past several years, and has been substantially under that amount during the pendency of the case. AWP's projection of gross sales post confirmation is $360,000.00 a month, but the projection is not based on anything other than faith and hope. Gross sales fell short of projections for the three months prior to confirmation by approximately $80,000.00 each month.

■■■ AWP argues that none of this matters because it has never missed a payment to the Bank, and, that when cash available might otherwise be short it can adjust its operating expenses to compensate. The plan requires payments to cred-

1. Servicemaster, another secured creditor, joins in this objection. The Bank also claims that the plan is not proposed in good faith, but the record is devoid of any evidence that would support the claim. Essentially, the Bank argues that since the proposed plan is not confirmable in the Bank's view, it must have been offered in bad faith.

itors other than the Bank. Feasible plans are fashioned on reliable financial projections, not on projected fly-by-the-pants ad hoc adjustments to compensate for expected shortages. If the plane cannot fly, it needs to be fixed before, not after, it leaves the ground.

The proposed plan is not feasible because it fails to provide a solution to what AWP recognizes is the basic problem:

> AWP's main weakness is the fact that it is under capitalized and relies on collection of receivables; as well as customers' downpayments and progress payments to finance its work on behalf of the same customers. AWP also gives up profit by occasionally having the customer supply materials in lieu of cash, giving up its mark-up on materials, when AWP cannot cash flow with its vendors.

AWP Disclosure Statement, 5–6. The plan does not provide for capital infusion.[2]

*Fair and Equitable Considerations*

The Bank makes a lengthy and impassioned argument that it is being treated unfairly and inequitably under the proposed plan. Much of it basically boils down to a complaint that the Bank, a senior class with a matured obligation coming into the case, would be held captive for seven years, in what the Bank claims would be an environment of extreme risk, long after all junior classes have been paid. Adding insult to the Bank's perceived injury is that the unsecured creditor class would be paid in full with interest within four years. Whether seven years debt

amortization would be fair and equitable to the Bank depends on the level of feasibility above the required threshold that a plan has, what the Bank's collateral position is, and what is offered to compensate for the risk of failure. Since the proposed variable interest rate fails for other reasons, and the plan has not been shown to be feasible, the issue is not reached.

■ The proposed plan is not fair and equitable to the Bank, though, to the extent that the bank would be delayed the right to pursue insider third party guarantors. Aside from whether a delay might ever be determined appropriate in the Eighth Circuit, it would be entirely inappropriate here. The stay would apply to Gary Gruett, his father-in-law's estate, and to the Gruett–Labriola Limited Partnership. Relief against co-debtors has been allowed elsewhere where there has been found to exist extraordinary circumstances, the release or delay has been found to be fair and equitable, and the parties adversely effected have been compensated for the stay or release. *See In re Continental Airlines*, 203 F.3d 203, 212 (3rd Cir.2000).

None of these criteria have been shown in this case. Gary Gruett, the only guarantor significantly connected with AWP, has not explained what extraordinary circumstance might exist to justify a stay. His father-in-law's estate has no connection with AWP, and the Gruett–Labriola Limited Partnership is simply AWP's wealthy landlord[3]. No compensation has

**2.** Why AWP did not propose a plan that would impose the kind of solution on the Bank that AWP sought prepetition is a mystery. Such a cramdown would substantially reduce the Bank's debt and result in a $400,000.00 capital infusion, providing a $200,000.00 line of credit that AWP needs to compensate for uneven cashflow. AWP offered testimony that AWP might obtain addi-

tional capital, but was not committed to do so. No testimony was provided that the prepetition investors are no longer available or willing to invest if the Bank were forced to participate on reasonable terms.

**3.** There exists approximately $1,500,000.00 equity in the property.

been offered to the dissenting classes for a stay.

Granting a stay would not be fair and equitable. The reasons for AWP's present undercapitalization stem largely, if not entirely, from miscalculations in moving into AWP's present facility rented form the Gruett–Labriola Limited Partnership. AWP substantially miscalculated the cost of the move, added at least $300,000.00 a year in rent associated expenses, and substantially overestimated projected future gross sales. All of this resulted in AWP's critical financial illness and benefitted only Gruett–Labriola Limited Partnership, which continues to siphon $25,000.00 each month in additional rent associated payments from a cash starved debtor while building equity in its property for AWP's insider partners. And, the plan proposes to assume the lease. Staying dissenting classes from seeking remedies against the guarantors under these circumstances would be unfair and inequitable.

## V

Accordingly, the debtor's plan, dated February 15, 2005, is not confirmable, and it is hereby **ORDERED that confirmation is denied.**